NOTICE
Decision filed 06/20/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 190426-B

NOS. 5-19-0426, 5-22-0786 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 17-CF-700 |
| | ) | |
| DIMITRI JOHNSON, | ) | Honorable |
| | ) | Brian D. Lewis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Vaughan and McHaney* concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, the defendant, Dimitri Johnson, was found guilty of unlawful possession of cannabis (720 ILCS 550/4(d) (West 2016)) and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)). The defendant appealed, arguing that the trial court failed to conduct an inquiry into the defendant's *pro se* allegations of ineffective assistance of trial counsel and that the appointment of posttrial counsel did not cure the trial court's error in failing to conduct a preliminary inquiry. The defendant also contended that he was denied a fair trial because the prosecutor made several improper remarks during closing argument or, in the

---

*Justice Wharton was originally assigned to this case but has since retired. Justice McHaney was subsequently assigned to replace Justice Wharton. Justice McHaney has reviewed the briefs in this case.

1

alternative, that trial counsel was ineffective for failing to properly preserve this claim for our review.

¶ 2     On May 12, 2022, this court remanded the defendant's case pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), with directions to the trial court to conduct a proper inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. We did not address the defendant's contention concerning prosecutorial misconduct during closing argument, indicating that the defendant could raise this issue in a separate appeal following the preliminary inquiry. The defendant filed a petition for rehearing, asking this court to address the defendant's argument regarding the prosecuting attorney's closing argument. This court denied the petition for rehearing, and the mandate was issued on July 6, 2022. *People v. Johnson*, 2022 IL App (5th) 190426-U.

¶ 3     On September 7, 2022, pursuant to remand, the trial court conducted a preliminary inquiry into the defendant's *pro se* claims of ineffective assistance of trial counsel. After hearing from the defendant, the trial court appointed new counsel to review the defendant's ineffective assistance claims and set the matter for a status hearing. On November 9, 2022, while represented by counsel, the defendant notified the trial court that he wanted to withdraw his claims of ineffective assistance of trial counsel and return the case to the appellate court to consider his argument as to the propriety of the State's closing argument. After questioning the defendant about whether anyone had forced him to make the decision to withdraw the ineffective assistance claims, the trial court accepted the defendant's decision. On December 6, 2022, the defendant filed an "Amended Notice of Appeal" and listed the appellate court number as 5-19-0426 (the initial appeal). By letter dated December 7, 2022, the clerk of this court acknowledged receipt of the defendant's notice of appeal, filed it, and docketed it under No. 5-22-0786.

2

¶ 4     On January 18, 2023, the defendant filed a motion for a supervisory order, asking the Illinois Supreme Court to direct this court to recall its mandate in 5-19-0426, and address the defendant's claim regarding the State's closing argument. The supreme court granted the defendant's motion, and the mandate was recalled on January 27, 2023. *People v. Johnson*, No. 129311 (Ill. Jan. 27, 2023) (supervisory order).

¶ 5     Subsequently, on March 6, 2023, the defendant filed a motion to consolidate the appeals in 5-19-0426 and 5-22-0786. On March 16, 2023, this court granted the defendant's motion and consolidated the appeals under 5-19-0426. This court also advised the parties that the defendant's supplemental brief was due on March 22, 2023. The defendant filed his supplemental brief on March 21, 2023. Therein, the defendant expressly withdrew the first argument made in his initial brief filed on March 25, 2021, in which he claimed that the trial court failed to make an inquiry into his ineffective assistance claims under *Krankel*. The defendant requests that this court reverse his convictions and remand his case for a new trial, based upon the arguments previously made regarding prosecutorial misconduct during closing argument. For the reasons that follow, we affirm the defendant's convictions.

¶ 6                              I. BACKGROUND

¶ 7     The evidence at the defendant's jury trial was as follows. On December 19, 2017, at approximately 10 a.m., Detective Jesse Thompson and Sergeant Warren Blake were conducting surveillance at the defendant's residence located at 2600 North 8th Street in Herrin, Illinois, as part of an investigation of the defendant. The residence is located on a corner lot. Detective Thompson and Sergeant Blake were in an unmarked car that had no police lights, sirens, or recording capabilities. They were positioned south and east of the house. Detective Thompson could see the entire south and east side of the house from his car. Detective Thompson noted that there were

entrances to the house on the east and the west side of the residence. Detective Thompson could not state which door the occupants normally used.

¶ 8    Additional law enforcement officers involved in the investigation were stationed at other locations. Detective Justin Dwyer was in a separate vehicle located approximately two blocks away from the residence. Police Chief Tondini was also nearby in her own vehicle. Officer Robert Kraemer, a K-9 handler, was in his K-9 unit located near the Marion, Illinois, city limits.

¶ 9    At approximately 12:30 p.m., the defendant and his girlfriend, Jessica Keeling, exited the residence. The defendant was carrying a black duffel bag. The defendant and Keeling got into a white 2005 Mercury Mountaineer registered to Keeling. The Mercury was a four-door SUV with tinted windows. Keeling entered the front, driver's side, and the defendant entered the front, passenger side, placing the duffel bag on the floorboard by his feet. Another individual, Jaylyn Phillips, sat in the rear passenger's side seat. A pit bull sat in the rear middle seat. Keeling's child sat in the rear driver's side seat.

¶ 10    The Mercury left the residence, and Detective Thompson and Sergeant Blake followed the vehicle. As the Mercury traveled through Herrin, on its way to Marion, different officers followed the Mercury in their respective vehicles at different points on the route. During this time, Detective Dwyer was informed over the radio that Detective Thompson had observed Keeling commit a traffic violation by making an abrupt right turn. Specifically, Keeling "failed to provide the mandatory 200 feet of notification for indicating [her] intention to make a turn." Because Detective Thompson did not have police lights or a siren, Officer Kraemer was asked to initiate a traffic stop of the Mercury. Officer Kraemer, who was several blocks away, went to the location of the Mercury and activated his lights to stop the vehicle. Detective Thompson and Officer Kraemer

4

both participated in the traffic stop, which occurred approximately 20 to 30 minutes after the Mercury originally left the residence.

¶ 11    Once the Mercury was stopped, Deputy Thompson approached the passenger side of the Mercury, and Officer Kraemer approached the driver's side. Officer Kraemer's K-9 was present at the scene but was not walked around the Mercury. Detective Thompson requested that the occupants of the Mercury roll down their windows because he could not see inside. The occupants complied. Once the windows were rolled down, Detective Thompson immediately detected an odor of cannabis and saw a metal cannabis smoking pipe in the passenger side door pocket. Detective Dwyer also arrived, and as he approached the vehicle, he detected an odor of raw cannabis coming from the Mercury. Detective Thompson ordered the occupants to exit the Mercury. The defendant, Keeling, and Phillips exited the Mercury, along with the pit bull. Keeling's child remained inside the car.

¶ 12    After the defendant, Keeling, and Phillips exited the Mercury, Detective Thompson removed the black duffel bag from the floorboard of the vehicle where the defendant had been seated. The duffel bag was partially unzipped, but Detective Thompson could not see inside the bag. Detective Thompson unzipped the duffel bag and, when he looked inside, saw a firearm and a bag containing suspected cannabis. The firearm was a 9-millimeter pistol with a magazine containing 16 rounds of ammunition. The suspected cannabis field-tested positive for cannabis. The bag of suspected cannabis was later determined to weigh 116 grams.

¶ 13    At the scene of the stop, Detective Dwyer interviewed the defendant. Detective Dwyer provided the defendant with *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and the defendant indicated that he understood his rights. The defendant then stated that the contents of the black duffel bag belonged to him. He indicated that he was holding the pistol for a

5

friend and that the other occupants of the Mercury were unaware of what was in the duffel bag. The defendant had asked Keeling to run an errand for him but did not elaborate any further. The defendant claimed that prior to the traffic stop, he was planning to return the firearm to its original owner. The defendant told Detective Dwyer that the defendant had never fired the gun, but he had taken it in and out of the duffel bag several times. He admitted that his fingerprints would be found on the weapon. Detective Dwyer ran a criminal history check of the defendant and learned that he was a convicted felon. The defendant was placed under arrest and transported to the police station. The interview of the defendant at the scene of the stop was not recorded.

¶ 14    Keeling and Phillips were also provided with *Miranda* warnings and interviewed at the scene of the stop. Keeling was issued a traffic citation. Phillips was cited for possession of drug paraphernalia for the metal cannabis smoking pipe. Keeling and Phillips were allowed to leave the scene of the traffic stop.

¶ 15    At the police station, Detective Dwyer interviewed the defendant a second time. The defendant was again provided with *Miranda* warnings and signed a *Miranda* waiver form. The defendant told Detective Dwyer that the firearm belonged to a friend who lived near the defendant. The defendant stated that his friend's house had been raided by law enforcement, and, during the raid, the officers had missed the pistol. The defendant made a written statement in which he wrote: "Jessica Keeling and Jaelyn Phillips were completely unaware of the cannabis and firearm in the vehicle." When Detective Dwyer told the defendant that officers were obtaining a search warrant for his residence, he became emotional and started to cry. He told Detective Dwyer that there was three-quarters of a pound of cannabis in a cooler inside the defendant's bedroom closet. The defendant also told Detective Dwyer that there were vials of cannabis wax inside the defendant's bedroom. The defendant indicated that he was the only person at the residence who was aware of

6

the cannabis and cannabis wax. The interview of the defendant at the police station was not recorded.

¶ 16    Officers obtained a search warrant for the defendant's residence. When the officers arrived at the defendant's residence, Keeling's mother, who was the landlord, allowed the officers inside the residence. Detective Dwyer searched the defendant's closet and located the cooler. When Detective Dwyer opened the cooler, he detected an odor of raw cannabis and observed a large bag of suspected cannabis. The bag of suspected cannabis weighed approximately 372 grams and field-tested positive for cannabis. The cooler also contained packaging material, a cup with cannabis residue, a digital scale, and plastic baggies. A tag taped to the side of the cooler bore the defendant's name and phone number. Vials of suspected cannabis wax, a shipping box, and a payment receipt were also found in the residence. The shipping box and payment receipt contained the defendant's name and listed his address as 2600 North 8th Street, Herrin, Illinois.

¶ 17    Danielle Adair, a forensic scientist at the Illinois State Police crime lab, determined that the suspected cannabis found in the cooler weighed 335 grams and tested positive for cannabis. She did not analyze the suspected cannabis from the duffel bag or the cannabis wax because the total weight did not exceed 500 grams, which would have been necessary to obtain a higher class of felony charge.

¶ 18    At trial, the parties stipulated that the defendant was a convicted felon. The defendant did not testify or present any evidence. Before the parties made their closing arguments, the trial court instructed the jury on closing arguments, which included the following:

> "What lawyers say during the arguments is not evidence and should not be
> considered by you as evidence. If a lawyer makes a statement that is not based on
> the evidence or reasonable inferences to be drawn from the evidence, you should

disregard the statement. You are to rely upon your own recollection of the evidence."

¶ 19    In the opening portion of the State's closing argument, the prosecutor reviewed the elements of the charged offenses. The prosecutor argued that the evidence produced during the trial was sufficient to find the defendant guilty.

¶ 20    In the defendant's closing argument, defense counsel argued that the State's case began "with some kind of undefined suspicion or investigation" and that law enforcement set up an elaborate surveillance system, following "this young family" for a half hour. Defense counsel remarked that it took the police a half hour to determine whether any laws had been broken and accused law enforcement of "fishing." Defense counsel asserted that law enforcement manufactured a reason to stop the car—the failure to signal a full 200 feet before the turn. Defense counsel commented that the officer who actually witnessed the traffic violation was the same officer who could not identify which door of the defendant's house was the front door. Defense counsel then highlighted the fact that law enforcement did not record the stop or deploy the K-9 to conduct a sniff of the vehicle. Defense counsel accused law enforcement of short-cutting "the system," not doing their jobs, and manufacturing a traffic stop. Defense counsel also remarked that if law enforcement had done their investigation properly, the defendant could have been stopped at his house.

¶ 21    Regarding the defendant's written statement, defense counsel indicated that she believed the statement looked as if the defendant was trying to protect his family and friend. Defense counsel then commented, "We don't know the circumstances, and we can't even begin to imagine what—the pressure that was exerted." Defense counsel faulted Detective Dwyer for not recording the interviews with the defendant at the scene or at the police station.

¶ 22   Defense counsel also faulted law enforcement for not testing the gun for fingerprints. Defense counsel concluded her closing argument by stating that this case was about "the fact that we have rights." Counsel stated that people have the rights to due process, equal protection, to be secure in their person, to be presumed innocent, and to justice. Defense counsel reminded the jury that the State had the burden of proving the case beyond a reasonable doubt and asked that the jury enter a verdict of not guilty.

¶ 23   Because the defendant has challenged large portions of the State's rebuttal closing argument, we believe it is helpful to reproduce the rebuttal argument in its entirety.

> "MR. DEMELLO: Thank you, Judge. Ladies and gentlemen, there is something that goes on that's happening in society more and more, and I just witnessed it happen again. It's called blame-shifting. We're from a society where people aren't accountable for what they do anymore. We're holding police to standards today—and it's very popular today to critique them. And I want to say for a minute out loud that there is a gun that was involved in a drug house that made it on the street to another convicted felon that was loaded. Good job police. They did what we want them to do. They did what they are paid to do. Thank goodness this gun is off the street. Is it that hard for—anyone can see of where these weapons that go from one drug house to a convicted felon what happens with these firearms. [Defense counsel] wants to waive [*sic*] the flag of rights. What about the rights of society and the people in this county that are on the receiving end of this type of activity? It is easy to shift the blame, but let's look at who bears responsibility. Who made this young man violate the laws of this State and become a convicted felon? Where is his accountability and responsibility for that? Where is his accountability

9

and responsibility for having a household that's got not only a quarter bag of cannabis but another three quarter pound bag of cannabis with scales, with plastic bags, with THC wax. Whose responsibility is that? Whose responsibility is it—even if you say in society people are a felon, paid their debt to society, why would you then take transfer of a gun, decide to put it in a car where a four-year-old child is in? Let's talk about the rights of people, with a pit bull, a gun, a felon, and cannabis in a car with a young child, and let's talk about this—well, I tell you about blame-shifting; having things two way [*sic*]. [Defense counsel] made a point to go to Detective Dwyer and say, 'This pit bull wasn't mean, was it? It was a family dog.' And I knew what she was doing. She was trying to minimize the fact that the pit bull was in the car. That's fine. It could have been a fun, family dog. But let's take a look from the law enforcement side and show you professionalism and restraint, because I guarantee you most of you are dog owners. I am. What would have happened if the officer took an alpha male, German Shepard [*sic*] drug dog and moved it to a car that a four-year-old who is in with a pit bull? What would that pit bull have done? What would have happened? That's restraint. That's what we want police to do in this country. You don't pull a drug dog out. Why would you need a drug dog? You walked up to the car—I could smell the pot from here in the bag. It's in the car. He smells it. Why do we need a dog to tell me what I already smell? That's restraint.

What else is restraint by police? Using a key to go in a house. Not kicking in a door. It's not breaking down doors. 'Ma'am, do you have a key?' Calmly

entering the house with a key. That's what we want our police to do. They did a good job here.

Let's talk about more restraint, the lab. The police had the ability to call the lab and say, 'Hey, we're going for it here. Test that. Test that. Test that.' Did it happen? No. We're not pouring salt on a wound. We're not stacking things here. It is what it is. The big bag was enough to do the charge, and they keep pushing to press it further.

And let's talk about good police procedure cause there was something here that very quiet [*sic*] no one's acknowledging. Detective Thompson, who he pretty much just got made fun of in this courtroom of being stupid, it was a corner house. A corner house has multiple sides facing the road. He's a nice guy. He wasn't trying to be difficult. I am sure he doesn't—sure he's going to love that he was basically called dumb, but the truth is there is two sides of the house facing the road. He said, 'I don't know what was used for the front door.' Well, guess what, ladies and gentlemen? I haven't used my front door in three years on my house. I come in and out of my garage with the garage door opener. Does that make me stupid, too? But let's look at what happened here. Let's get real with each other. We like that term in society. 'Get real.' Detective Thompson wrote up every single thing they did on that day to get a search warrant. I guarantee you that these people in black in our county who review everything that happened that day are not stupid. They don't get to that level of being stupid. They are judging because they know the law. A Judge reviewed everything those police did that day—

[DEFENSE COUNSEL]: Objection, your Honor.

11

MR. DEMELLO:—and did what? Granted a search—

THE COURT:—hold up. Hold on, Mr. [D]eMello. There is an objection.

[DEFENSE COUNSEL]: That is a miss-statement to the law, the search warrant, and I believe we have now gone way beyond rebuttal.

THE COURT: The jury will disregard anything that is not evidence, any inference that is not based in law. You will base your verdict solely on the evidence that you have heard and the law as is given to you. All right. Go ahead.

MR. DEMELLO: Detective Thompson acquired the search warrant. Would he have acquired the search warrant—you can draw reasonable inferences from the evidence that everything they did was wrong and illegal. When I say blame-shifting, we have, again, an individual who was under investigation. When I inquire of the detectives what was the investigation about, there was an objection. I could not get into it. Do you think these police just decided to get up that morning and said, 'Guys, we're all bored and nothing else to do. Let's go hang out and see if this guy may or may not come out of his house, may or may not have drugs and weapons on him,' or do you think it's more plausible that as part of their investigation they knew about activity? The inference from the evidence is he already had contact with people of another drug house and got a gun from them. You think for a minute maybe our police aren't stupid—

[DEFENSE COUNSEL]:—Judge—

MR. DEMELLO:—and I couldn't get into it—

THE COURT:—hold on. There is another objection.

12

[DEFENSE COUNSEL]: That does mischaracterize the evidence and the statement, and that is not a reasonable inference. We are now way off evidence.

THE COURT: Try to stay within the bounds of the evidence and reasonable inferences, all right.

MR. DEMELLO: Judge, I think a reasonable inference is that they said there were facets of the investigation, and that's why they were there. And [defense counsel]'s making the comment that he followed him for 25 minutes. Part of it they stopped at a gas station, okay, and the other part, yes, they were following him. He was the object of the investigation. They were conducting a loose surveillance. Did the police know what they were doing? Well, what did they find? Did they have information that was valid? There is nothing illegal once that officer smelled cannabis in the car and ordered him out of the car. I said to Detective Thompson, 'Was he under arrest immediately because of the traffic violation?' He said, 'No.' It wasn't until the bag was out and open that he was placed under arrest. The defendant didn't get the traffic ticket. Ms. Keeling did. If Ms. Keeling didn't like the traffic stop, she has all the rights and privileges of every other U.S. citizen to challenge that ticket. That has nothing to do with the fact that the defendant had the gun and cannabis in his bag. When the officer did the traffic stop, if he had no cannabis or gun in the bag, guess what [the defendant] is arrested for? Nothing. Because as a young man as a convicted felon, you make the decision not to have a bag of cannabis and a gun from another drug house. That's why he was arrested. It's called a red herring. You're chasing a rabbit hole on the whole traffic. The traffic stop of Ms. Keeling, if she doesn't like the traffic stop, she can challenge it.

13

If the judges don't like the traffic stop, maybe the search warrant isn't granted. The truth is he had the marijuana and the gun. So, please, when we sit here, this is your county. We don't have much say in anything now-a-days. The government makes most of the decisions for us, but guess what? You decide what's appropriate today in Williamson County. You get to have that say. Not the Judge. Not me. You, with your verdicts. If you feel this behavior of everything that happened here was fine, you have no problem with it, then by all means sign a not guilty verdict. It's your county. You go to church here. Your kids are here. You work here. Your house may be next door to these houses where all this is going on. Do you feel safe? That's up to you, but I don't think the evidence is contradicted. All they have done is blame-shift. We have shifted blame; blamed and tried to make officers look stupid and undedicated and gung-ho. Let me ask you something. They supposedly followed him for 20 minutes as if they were all out to get him. Do you see a single one of those officers in this courtroom today? If I was so gung-ho to get somebody, wouldn't I be interested to come in and watch closing arguments to see what was going on? They are not here. You know where they are? They are back out at it. They did their job here. They got the drugs and the weapon off the street, and I'm asking you to send a message this is not acceptable in Williamson County. This is not about whether you like or dislike police. It's about the actions of this man. Anything else is shifting blame, and it's something that I'm asking you not to allow to happen. Thank you."

¶ 24    After the closing arguments were complete, the trial court recited the jury instructions for the jury. This included the following instruction:

14

"Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 25 Following deliberations, the jury found the defendant guilty of unlawful possession of cannabis and unlawful possession of a weapon by a felon. Although the defendant filed a posttrial motion, he did not allege any error in the State's closing argument. At a hearing, the trial court denied the defendant's posttrial motion and proceeded to sentencing. During the sentencing hearing, the defendant made a statement in allocution in which he stated the following:

"For one, I would like to bring to the Court's attention that I felt a prior ineffect—provided ineffectual [*sic*] counsel due to the fact that during the course of my trial testimonies were given that should have been objected to; that there were no recorded or written evidence factually lies.

But in this case it was—it was my lawyer's responsibility to address these matters as well as providing me with my discovery in a timely manner, a discovery in which I've still yet to see.

I hope these things would be considered in finding a proper sentence for me."

The trial court asked trial counsel, "Anything?" to which trial counsel stated, "No, Your Honor."

¶ 26 The trial court sentenced the defendant to 6 years in the Illinois Department of Corrections (IDOC) on his conviction for unlawful possession of cannabis and 10 years in IDOC on the conviction for the unlawful possession of a weapon by a felon. The sentences were ordered to run concurrently and to be followed by two years of mandatory supervised release.

15

¶ 27 The defendant filed a motion to reconsider his sentence. Trial counsel subsequently sought to withdraw as the defendant's attorney because the defendant had indicated at sentencing that he believed trial counsel provided ineffective assistance. The trial court allowed trial counsel to withdraw and appointed new posttrial counsel to represent the defendant. Posttrial counsel did not file any motion concerning the defendant's *pro se* allegations of ineffective assistance of counsel. The trial court held a hearing on the defendant's motion to reconsider sentence and denied the motion. The defendant's *pro se* allegations of ineffective assistance of counsel were not discussed at this hearing.

¶ 28                                    II. ANALYSIS

¶ 29              A. Prosecutorial Misconduct During Closing Arguments

¶ 30 The defendant contends that he was denied a fair trial because, during the rebuttal portion of the State's closing argument, the prosecuting attorney advanced an "us-versus-them" theme, inserted himself into the argument, and argued facts not in evidence. The defendant did not object to most of the remarks he now challenges, nor did he include any alleged error regarding closing argument in his posttrial motion. Thus, his arguments are forfeited and reviewable only for plain error. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

¶ 31 The plain error doctrine permits a reviewing court to consider unpreserved error if a clear and obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 564-65. The plain error doctrine is not a general saving clause preserving for review all errors affecting substantial rights, whether or not they had been brought to the trial court's

16

attention. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). Rather, it is a narrow and limited exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process. *Herron*, 215 Ill. 2d at 177.

¶ 32    Here, the defendant claims that the prosecutor made several improper remarks, which resulted in error under the second prong of the plain error doctrine. The burden of persuasion lies with the defendant. *Herron*, 215 Ill. 2d at 187. The first step in plain error review is to determine whether error occurred at all. *Piatkowski*, 225 Ill. 2d at 565.

¶ 33    Generally, prosecutors are afforded wide latitude during closing argument. *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 49. They may properly comment on the evidence presented and reasonable inferences drawn therefrom, respond to comments made by defense counsel that invite a response, and comment on the credibility of witnesses. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. It is improper for a prosecutor to misstate the evidence or argue facts not in evidence. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47. It is also improper for a prosecutor to personally vouch for the credibility of a witness or bolster a witness's testimony. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47.

¶ 34    Furthermore, closing arguments must serve a purpose beyond inflaming the jury's emotions. *People v. Wheeler*, 226 Ill. 2d 92, 128 (2007). Closing arguments cannot be used to simply inflame the passions of the jury or develop the prejudices of the jury without casting any light upon the issues. *Wheeler*, 226 Ill. 2d at 128-29. Prosecutors may dwell upon the evil results of crime and urge the fearless administration of the law. *People v. James*, 2021 IL App (1st) 180509, ¶ 41. They may not, however, "utilize closing argument to forge an 'us-versus-them' mentality that is inconsistent with the criminal trial principle that a jury fulfills a nonpartisan role, under the presumption that a defendant is innocent until proven guilty." *Wheeler*, 226 Ill. 2d at 129

17

(citing *People v. Johnson*, 208 Ill. 2d 53, 80 (2003)). Limited exhortations by a prosecutor are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent solely upon the jury's careful consideration of the specific facts and issues before it. *Johnson*, 208 Ill. 2d at 79. Prosecutors may not, however, blur that distinction with an extended and general denunciation of society's ills and, in effect, challenge the jury to send a message through its verdict. *Johnson*, 208 Ill. 2d at 79. In doing this, a prosecutor does more than urge the fearless administration of justice. *Johnson*, 208 Ill. 2d at 79. Instead, the prosecutor interjects matters that have no real bearing upon the case at hand and seeks "to incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation." *Johnson*, 208 Ill. 2d at 79.

¶ 35    Defendants arguing for reversal of their conviction based upon improper closing argument face a difficult burden. *Holmon*, 2019 IL App (5th) 160207, ¶ 48. Improper remarks made during closing argument warrant reversal only if those remarks resulted in substantial prejudice to the defendant. *Marzonie*, 2018 IL App (4th) 160107, ¶ 48. Substantial prejudice occurs if the improper remarks constituted a material factor in the defendant's conviction. *Marzonie*, 2018 IL App (4th) 160107, ¶ 48. Improper remarks constitute a material factor if the jury could have reached a contrary verdict had the improper remarks not been made or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction. *Wheeler*, 226 Ill. 2d at 123. This standard is similar to the standard applied in plain error analysis. *People v. Jackson*, 2020 IL 124112, ¶ 83. When reviewing challenges to a prosecutor's remarks made during closing argument, the challenged remarks must be viewed in the context of closing argument as a whole. *Holmon*, 2019 IL App (5th) 160207, ¶ 51.

¶ 36    The defendant contends that the prosecutor improperly argued facts not in evidence when the prosecutor commented about an earlier investigation and surveillance of the defendant that were not admitted at trial. During the rebuttal portion of the State's closing argument, the prosecutor argued that a reasonable inference from the evidence was that law enforcement knew the defendant was engaged in some sort of activity as part of their investigation into the defendant. The prosecutor further argued that another inference that could be drawn from the evidence was that the defendant knew people from another drug house and had received a gun from them. Defense counsel objected and stated, "We are now way off evidence." The trial court admonished the prosecutor to "[t]ry to stay within the bounds of the evidence and reasonable inferences." The prosecutor responded there was a reasonable inference that there were "facets" of the investigation and that the defendant was the object of that investigation. The prosecutor noted that defense counsel had made an argument that law enforcement had followed the defendant for 25 minutes.

¶ 37    We do not find that the complained-of portion of the prosecutor's argument here constituted error. At trial, Detective Dwyer testified that the defendant was the subject of an investigation by law enforcement. Although the reasons for any prior investigation were not divulged at trial, the jury still learned that the defendant was under investigation. The evidence at trial also showed that the defendant received the gun in this case from another individual whose house had been previously raided by law enforcement. Thus, the prosecutor's argument was based on the evidence or reasonable inferences that could be drawn from the evidence offered at trial and was not improper.

¶ 38    The prosecutor's argument was also made in response to defense counsel's argument that this case began with an "undefined suspicion" and that law enforcement followed the defendant around for a lengthy period of time before manufacturing a reason to stop the car in which the

defendant was a passenger. Defense counsel had suggested that the defendant was the victim of a law enforcement fishing expedition. Thus, the prosecutor was within the bounds of proper argument to counter the defense's argument with the fact that the defendant was the subject of an investigation.

¶ 39 The defendant also contends that the prosecutor improperly inserted himself into the closing argument, thereby vouching for the credibility of the State's witnesses. The defendant argues that the prosecutor vouched for the police officers and "other people associated with the State" when the prosecutor argued that he could "smell the pot from here in the bag," that he had not used his front doors in three years, and that he guaranteed "these people in black *** who review everything that happened that day are not stupid."

¶ 40 We are troubled by the third challenged remark because the prosecutor guaranteed that "these people in black," seemingly referring to judges, were not stupid. The prosecutor's argument gave the impression that a judge had reviewed everything that had occurred and authorized a search warrant, thereby placing a stamp of approval on the activities of law enforcement that day. The prosecutor's argument thus suggested that the jury should likewise place their stamp of approval on the conduct of the police officers that day. By making this argument, the prosecutor improperly vouched for the credibility of the police officer witnesses. The other remarks were also improper, although somewhat less egregious.

¶ 41 Finally, the defendant contends that the prosecutor improperly advanced an "us-versus-them" theme. We agree. During the rebuttal portion of closing argument, the prosecutor argued that the police "did what we want them to do" and "did what they are paid to do" by getting a gun off the street. The prosecutor later improperly aligned the jury's interest in their own safety with that of the State's interest in convicting the defendant. The prosecutor improperly argued that the

jury got to decide what was appropriate in Williamson County, making extraneous comments that went far beyond the evidence and rebuttal in this case. Indeed, the prosecutor challenged the jury to return a not guilty verdict if they did not have any problems with the defendant's conduct. The prosecutor remarked, "It's your county. You go to church here. Your kids are here. You work here. Your house may be next door to these houses where all this is going on. Do you feel safe?" And finally, the prosecutor implored the jury to "send a message" that "this is not acceptable in Williamson County."

¶ 42    After reviewing the record, we find that the prosecutor's rebuttal arguments advanced an "us-versus-them" theme and were improper. The prosecutor used the rebuttal portion of closing argument to align the jury's interest in their own safety with the State's interest in convicting the defendant. In making this argument, the prosecutor intimated that if the jury did not find the defendant guilty, Williamson County would not be a safe place to live, work, or raise children. The prosecutor's request to the jury to "send a message," when considered in the context of the entire rebuttal argument, was also improper. These arguments did not focus on the evidence at trial or whether the State proved the elements of the charged crimes beyond a reasonable doubt. Instead, the prosecutor's arguments served no other purpose than to inflame the passions of the jury against the defendant.

¶ 43    Having determined that the prosecutor made improper remarks during the rebuttal portion of closing argument, we must now consider whether those improper remarks warrant reversal under the second prong of the plain error doctrine. "In unusual cases, the cumulative effect of numerous errors can create a 'pervasive pattern of unfair prejudice' despite the fact that none of the errors, standing alone, would be serious enough to warrant consideration under the second prong." *Holmon*, 2019 IL App (5th) 160207, ¶ 47 (quoting *People v. Blue*, 189 Ill. 2d 99, 139

(2000)). In such cases, we ask whether the defendant's substantial rights have been affected to such a degree that we cannot state with confidence that the defendant's trial was fundamentally fair. *Holmon*, 2019 IL App (5th) 160207, ¶ 47. If that question is answered in the affirmative, reversal will be warranted, even if the evidence of the defendant's guilt is overwhelming. *Holmon*, 2019 IL App (5th) 160207, ¶ 47.

¶ 44    Recently, our supreme court indicated that "comments in prosecutorial closing arguments will rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants." *People v. Williams*, 2022 IL 126918, ¶ 56 (citing *People v. Moon*, 2022 IL 125959, ¶ 29). In *Moon*, our supreme court explained that second-prong plain error is the equivalent of structural error, which is error that "necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence." *Moon*, 2022 IL 125959, ¶ 28. Structural errors affect the framework within which the trial proceeds rather than mere errors in the trial process itself. *Moon*, 2022 IL 125959, ¶ 29. The United States Supreme Court has recognized errors as structural only in a very limited class of cases that include a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction. *Moon*, 2022 IL 125959, ¶ 29. Illinois courts are not limited to the errors deemed structural by the Supreme Court, but we often look to those types of errors to determine whether the error under consideration is comparable. *Moon*, 2022 IL 125959, ¶ 30.

¶ 45    Here, although the prosecutor made several improper remarks during closing argument, we do not find that reversal is warranted under the second prong of the plain error doctrine. We reach this conclusion for several reasons. Based upon the evidence presented, we do not believe that any

22

rational jury would have reached a contrary verdict had the improper remarks not been made. Therefore, we cannot say that the improper remarks contributed to the defendant's conviction. Further, the jury was properly instructed regarding closing arguments, thereby limiting potential prejudice. See *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103. The trial court also sustained a defense objection to the prosecutor's improper vouching for the police witnesses and admonished the jury, which cured any prejudice that might have flowed from this argument. See *Holmon*, 2019 IL App (5th) 160207, ¶ 61. Finally, we do not believe that the improper remarks here are comparable to structural error. The prosecutor's remarks were not so egregious that they threatened the fairness of the trial or the framework of the trial process itself. That said, we wish to make it clear that we do not condone the prosecutor's improper remarks in this case.

¶ 46      As an alternative to plain error, the defendant argues that defense counsel was ineffective for failing to preserve the defendant's claims regarding the prosecutor's improper remarks. To prove ineffective assistance of counsel, the defendant must show that counsel's representation fell below an objective standard of reasonableness and that but for counsel's unprofessional errors, a reasonable probability exists that the result of the proceedings would have been different. *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). Here, the defendant cannot show that a reasonable probability exists that the result of the proceedings would have been different had defense counsel objected to the prosecutor's improper remarks. Thus, the defendant's ineffective assistance of counsel claim fails.

¶ 47                                      B. *Krankel* Violation

¶ 48      As noted earlier in our decision, the defendant has withdrawn his argument that the trial court failed to make an inquiry into his *pro se* claims of ineffective assistance of trial court pursuant to *Krankel.* Accordingly, we will not consider that claim of error.

23

¶ 49                          III. CONCLUSION

¶ 50     For the foregoing reasons, the defendant's convictions are affirmed.

¶ 51     Affirmed.

*People v. Johnson*, 2023 IL App (5th) 190426-B

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, No. 17-CF-700; the Hon. Brian D. Lewis, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Ann B. McLennan, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Brandon Zanotti, State's Attorney, of Marion (Patrick Delfino, Patrick D. Daly, Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |