NOTICE
Decision filed 07/02/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240193-U

NO. 5-24-0193

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-1302 |
| | ) | |
| LUIS O. SOSA-MEJIA, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction is upheld where the prosecutor's closing arguments did not undermine defendant's constitutional right to a fair trial.

¶ 2    Defendant, Luis O. Sosa-Mejia, appeals his conviction, arguing that the prosecutor's closing argument undermined his right to a fair trial. For the following reasons, we affirm.

¶ 3                              BACKGROUND

¶ 4    On November 18, 2020, defendant was charged, by information, with aggravated criminal sexual abuse in violation of section 11-1.60(d) of the Criminal Code of 2012 (720 ILCS 5/11-1.60(d) (West 2020)), in that defendant, who was older than 17 years of age and at least five years older than the alleged victim, committed an act of sexual penetration with M.B., who was between the ages of 13 and 17, by placing his penis in her vagina for the purpose of sexual gratification.

1

Defendant was arraigned on November 18, 2020, a public defender was appointed, and defendant was released after posting bail the following day. However, defendant failed to appear for his next court date and a warrant for defendant's arrest was issued on December 9, 2020.

¶ 5 Defendant was arrested on October 28, 2022, and arraigned on November 3, 2022. He obtained private counsel on November 8, 2022. On July 3, 2023, the State filed a notice of intent to seek an extended term, alleging that defendant committed the alleged offense while M.B. was under the influence of alcohol and defendant knew, or should have known, M.B. consumed alcohol. On the same day, the State also filed a motion *in limine* requesting that any evidence as to M.B.'s perceived consent to engage in sexual activity on that evening, as well as her prior sexual activity or reputation, should be barred. The State also requested that it be allowed to present evidence that defendant served the victim intoxicants on the night of the incident and obtained alcohol for Emmanuel, M.B.'s older brother, when he was also underage.

¶ 6 On July 10, 2023, the State filed an additional motion *in limine* regarding any "direct and collateral consequences if convicted." The motion addressed defendant's potential sentences for the alleged charges, registration as a sex offender, and defendant's apparent lack of U.S. citizenship. On July 12, 2023, defense counsel filed a motion *in limine* requesting the court bar any evidence related to defendant providing drugs and alcohol to minors as those were uncharged offenses.

¶ 7 The motions were heard on July 27, 2023. The State's first motion related to M.B.'s perceived consent to engage in sexual activity on that evening was granted with no objection. A ruling on the State's second motion related to M.B.'s prior sexual activity or reputation was reserved after noting that M.B. had a child at the time of the incident and defendant's position that he believed her to be over 17 due to her status as a mother. The court granted the State's third

2

motion related to its ability to present evidence that defendant served the victim intoxicants on the night of the charged offense; however, the grant was limited to alcohol, not cocaine. The trial court granted the fourth motion *in limine* related to purchase of alcohol for underage minors, but the State was barred from discussing the circumstances involving the purchase of alcohol until or unless the defendant "opened that door." The court found that its rulings on the third and fourth motions also addressed defendant's motion *in limine*. The State agreed that since it was seeking an extended term, the issue of alcohol needed to be determined by the jury. The State's fifth motion (direct and collateral consequences of conviction) was granted with no objection.

¶ 8 Defendant's trial began on October 23, 2023. The State moved to amend the information to state defendant touched M.B.'s vagina; the motion was granted without objection. Following jury selection, the parties provided opening statements in which defendant's attorney admitted that defendant was intimate with M.B., leaving the only issue of whether defendant reasonably believed that M.B. was 17 years of age or older at the time of the incident.

¶ 9 M.B. testified that her date of birth was August 2, 2005. She got pregnant when she was 14 years old. The baby's father, Carlos, was 15 years old. M.B. and Carlos went to school together. Carlos was defendant's cousin. M.B. started the evening of October 20, 2020, at her mother's house with her friend Nicole. M.B. later decided that she was going to go out. M.B. stated that she did not drink before she went out and defendant purchased liquor after he picked her up. She testified that she remained in the car at the liquor store because she was too young to buy alcohol. Defendant and M.B., along with another couple, Jefferson and Vanessa, then went to a trailer park where they, and the owner of the trailer, drank and danced. A Snapchat video showing a bottle of alcohol in M.B.'s lap was shown to the jury. M.B. stated that she and Vanessa finished that bottle and M.B. left with defendant to get more liquor. At some point in the evening, M.B. sent a message

3

to Carlos to pick her up but M.B. did not recall anything else about the evening until she woke up at the hospital the next day in her sister's pajama pants. At that point, M.B. sent texts to defendant to find out what happened the night before.

¶ 10   On cross-examination, M.B. stated that she communicated with defendant in 2020 through Facebook and listed her age as 15 years old on Facebook. She did not know how long the parties were at the trailer park. She clarified that her message to Carlos said she did not feel well and needed help. She could not recall if she drank any of the alcohol after they went to the liquor store a second time. She could not remember anything after she rode with defendant the second time to the liquor store.

¶ 11   Nicole G. testified that she was 15 years old in 2020. She had known M.B. for seven or eight years. They went to school together and sometimes spent time together at M.B.'s house. In October 2020, M.B.'s baby was two months old. Nicole was watching M.B.'s child while M.B. went out that night. She stated that M.B. was not drinking before she left. When M.B. did not return, Nicole contacted M.B.'s mother and went back to her own house with the baby.

¶ 12   Carlos S. testified that he was 15 years old in 2020 and the father of M.B.'s baby. He had known M.B. for about four years and stated they were in the same grade at school. In October 2020, Carlos lived with his mom, stepdad, and brothers. He stated that defendant was his cousin, that he did not want to be in court and, given the choice, he would not be there. He stated that he and M.B. were arguing on October 20, 2020. Later that evening, he received a text message from M.B. asking him to pick her up because she needed help. He initially ignored the text because he was angry with her, but M.B.'s family started texting him wanting to know where she was, so he eventually helped look for M.B.

¶ 13 Carlos said that he headed to a house in Urbana because that was the location where his phone tracked M.B.'s location. Carlos went into the house because he saw Jefferson's car and to check if M.B. was there. He knew at that time that M.B.'s brother, Emmanuel, was also looking for M.B. Emmanuel was parked down the street. When Carlos went into the house, he saw a flashlight from a phone. As he headed to the room where the light was, he heard a girl moaning. When he got in the room Carlos saw defendant on top of M.B. and they were having sex. Carlos then got angry and told M.B. it was time to leave. He tried to take M.B. outside because her mom was also looking for her. At that time, M.B. was naked and appeared to have difficulty walking. He said that M.B.'s mom had to help M.B. into the van and M.B. stumbled on her way to the vehicle. He stated that M.B.'s speech was normal, but she was angry with everybody.

¶ 14 Carlos met up with Emmanuel outside the house after M.B. was in the van with her mother. Carlos was angry because he walked in on his girlfriend and his cousin. He stated that he trusted defendant and was surprised it happened. He said that defendant was older than him. He and Emmanuel went back into the house after M.B. was in the van to see if defendant was still there. However, defendant was already gone. Carlos then went to M.B.'s sister's apartment because they were going to take M.B. to the hospital. He did not go with them to the hospital. He confirmed that he and defendant lived in the same house at the time of the incident. He admitted that he popped the tires and broke some windows on defendant's car because he was angry about the incident. He also damaged Jefferson's car. He was arrested for those incidents, but the case was dismissed.

¶ 15 Carlos testified that he believed defendant knew how old he was. They were cousins and defendant knew Carlos his whole life. Carlos agreed that he previously lived in Honduras, as did defendant. Carlos came to the United States when he was 10 years old. Defendant came to live with Carlos's family six months prior to the incident.

¶ 16    Emmanuel B. testified that he was M.B.'s older brother. He said that he knew defendant because Carlos introduced him to defendant as M.B.'s older brother. Emmanual was 17 years old in the summer of 2020, and told defendant his age at that time. He agreed there was an evening in October 2020 when he was trying to find M.B. He began looking for her after she reached out to Carlos. Emmanuel found out where M.B. was and went to the address. Carlos was there when Emmanuel arrived. Carlos was walking down the street, and he seemed upset. When Emmanuel saw M.B., she was by the garage door and the bottom half of her clothes were missing. Emmanuel believed M.B. was intoxicated and unaware that she had no clothes on her bottom half. When he first saw M.B., he went into the house looking for defendant, but defendant was already gone. After that, Emmanuel grabbed his sister and took her to his other sister's house. On cross-examination, Emmanual clarified that M.B. was in the garage and wore a normal sweater on top. He stated he was not sure where he had the conversation with defendant about his age. On redirect, after a sidebar, Emmanuel stated that his age came up when previously talking to defendant because they were going to buy alcohol and that was when his age was addressed.

¶ 17    Rocio P. testified that she was M.B.'s mother. She received a message from Nicole on October 20, 2020, telling her M.B.'s location. She was with her son and granddaughter when they went to pick up M.B. Carlos was already there looking for M.B. When Rocio saw M.B. she was clothed from the waist up and naked from the waist down. M.B. was knocking on the front door trying to get back inside the house. She said that M.B. was not doing well and noted that M.B. did not recognize her at that time because she was so angry. She believed M.B. was intoxicated. Rocio knew who defendant was but never met or saw him in person. Emmanuel and Carlos helped put M.B. in the car and Rocio went to her other daughter's home so she could drop off M.B.'s child because Rocio was considering taking M.B. to the hospital. M.B. got pajama pants from her sister

6

and they took her to the hospital because they could not calm her down. On cross-examination, Rocio confirmed that when she saw M.B., she was trying to get back into the house.

¶ 18    Lucy Favila-Melero, a data analyst for the sheriff's office, testified that she was bilingual and was occasionally used to assist with Spanish speaking witnesses or suspects. She called defendant on November 17, 2020, to discuss a case involving damage to his car. An in-person meeting was scheduled. Lucy met with defendant in the sheriff's office conference room with two other investigators. The interview was videotaped. Lucy was there to translate for defendant because he did not know English. At some point, the interview moved from the damage to defendant's car to a sexual incident. She translated defendant's interview at the sheriff's office. On cross-examination, she agreed there were different dialects of Spanish. She stated that hers was Mexican, and defendant was from Honduras. She believed she was able to understand him accurately.

¶ 19    Following Lucy's testimony, the court read a stipulation of the parties. The stipulation stated, *inter alia*, that defendant's DNA was found on the vaginal swab collected as part of M.B.'s sexual assault testing at the hospital.

¶ 20    Dwayne Roelfs, a detective in the Champaign County Sheriff's Office, testified that he was involved in the investigation of M.B.'s sex case and the case involving Carlos's damage to defendant's car. Detective Roelfs participated in defendant's interview with Lucy and Detective Wakefield. He stated that the first portion of the videotaped interview involved the damage to defendant's car.

¶ 21    The interview was played and two people translated the parts that were in Spanish. Relevant to the case at issue, when the sexual investigation part of the interview began, defendant denied knowing M.B.'s name, being with M.B., or getting her drinks because she was "too young."

7

He later stated that his aunt previously told him when he was drinking beer at the house and the girls came by that he needed "to step away because there's young kids. And I was trying to. They are young kids, crazy-like, young kids." He further stated that Carlos only got jealous because he took M.B. to the liquor store. He repeatedly called M.B. "the young girl," Carlos, "the young boy," and that he "never disrespected the young girl." Later in the interview, defendant admitted he knew M.B. and claimed she was the aggressor and touched him when they were at the house. He stated that Carlos was 15 years old. As to M.B., defendant stated, "I don't know how old she is. She's a young girl." He stated, "She had to be underage. *** My aunt always tells me to try to avoid them because they were underage." He thought M.B. was maybe 16 or 17 years old but was not sure. He stated he was 23 years old at the time of the incident and agreed that he knew it was illegal to have sex with someone who was under the age of 17 years old. Following completion of the interview video, court ended for the day.

¶ 22    The trial resumed the next day and Detective Roelfs's testimony was completed. The State rested after submitting its evidence. Defense counsel moved for a directed verdict and the court denied the motion. Defense counsel advised the court that defendant did not wish to testify. The parties addressed the jury instructions and then provided closing arguments to the jury. The majority of the arguments during both the State's opening and defendant's argument addressed whether defendant reasonably believed M.B. was 17 years of age or older. Defense counsel addressed the State's timeline of when defendant stated he knew that having sex with someone under 17 was illegal and further stated that the jury was not there to "protect" the victim. During rebuttal argument, the prosecutor said:

> "The suggestion that she had been out drinking and, therefore, he thought she was older does not make sense when she was the one who waited out in the car when he went in to

8

buy alcohol, and when he, *** according to Emmanuel, was the one illegally buying alcohol for him. Age doesn't mean anything with respect to the defendant in terms of buying alcohol, and I'd submit it doesn't make doesn't mean anything to him with respect to the age of consent, either."

No objections were raised during closing argument.

¶ 23    Following closing arguments, the jury instructions were presented. The jury left to deliberate at 4:10 p.m. At 5:05 p.m., the jury reached its verdict and found defendant guilty. The jury was polled and released.

¶ 24    On November 27, 2023, defense counsel filed a posttrial motion claiming the State failed to prove defendant guilty beyond a reasonable doubt, for each element, including the affirmative defense of defendant's reasonable belief that the victim was 17 years of age or older. The posttrial motion and sentencing hearing was held on January 2, 2024. The trial court denied the posttrial motion. Subsequently, the court sentenced defendant to 48-months' probation and 180 days jail time, noting the latter was already served. Defendant timely appealed.

¶ 25                              ANALYSIS

¶ 26    Defendant argues that he is entitled to a new trial based on the State's improper closing arguments that included reliance on other crimes evidence, misstating the evidence, and inflammatory remarks. He concedes that no objection was raised for the remarks he now challenges and requests review of those remarks for plain error. In the alternative, defendant argues that his trial counsel provided ineffective assistance for failing to object to the prosecutor's statements during closing argument.

¶ 27    Generally, "[p]rosecutors are afforded wide latitude in closing argument." *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). Prosecutors may argue facts and reasonable inferences from that

9

evidence and may respond to comments made by defense counsel that invite response. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. However, it is improper to misstate the evidence, argue facts not in evidence, personally vouch for a witness's credibility, bolster testimony (*id.*) or use argument to inflame the jury's emotions. *People v. Wheeler*, 226 Ill. 2d 92, 128 (2007).

¶ 28 "Defendants arguing for reversal of their conviction based upon improper closing argument face a difficult burden." *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 35 (citing *People v. Holman*, 2019 IL App (5th) 160207, ¶ 48). When reviewing remarks presented during closing argument, this court asks whether the remarks created a substantial prejudice against the defendant such that it was impossible to state whether or not a guilty verdict resulted from the remarks. *Wheeler*, 226 Ill. 2d at 123. If this court finds that the jury could have reached a contrary verdict if the remarks were not made, or this court cannot determine the extent the prosecutor's statement contributed to the conviction, a new trial should be granted. *Id.*

¶ 29 As noted above, none of defendant's claims of error were properly preserved. As such, those claims are forfeited and reviewed only for plain error. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). "The plain error doctrine allows a reviewing court to consider an unpreserved error ***." *People v. Coats*, 2018 IL 121926, ¶ 9. "The plain error rule does not allow reviewing courts to consider all forfeited errors, however." *People v. Johnson*, 2024 IL 130191, ¶ 42 (citing *People v. Herron*, 215 Ill. 2d 167, 177 (2005)). "Rather, 'it is a narrow exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process.' " *Id.* (quoting *People v. Moon*, 2022 IL 125959, ¶ 21).

¶ 30 The plain error rule allows for review of forfeited error " '(1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a

clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." ' " *Coats*, 2018 IL 121926, ¶ 9 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 48, quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)); see also Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). "The first step in the plain error analysis is to determine whether a clear or obvious error occurred." *Johnson*, 2024 IL 130191, ¶ 44 (citing *Moon*, 2022 IL 125959, ¶ 22). Accordingly, we first address the errors alleged by defendant.

¶ 31    We classify defendant's claimed errors into three categories, some of which overlap. The alleged errors related to the prosecutor's closing arguments included (1) a reference to other crimes evidence, (2) mischaracterized evidence, and (3) alleged inflammatory statements.

¶ 32    " '[O]ther crimes evidence encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial.' " *People v. Sims*, 2019 IL App (3d) 170417, ¶ 28 (quoting *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005)). "Other-crimes evidence is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes." *Id.* (citing *People v. Wilson*, 214 Ill. 2d 127, 135 (2005)). Error in admitting other crimes evidence is harmless when the defendant is neither prejudiced nor denied a fair trial because of its admission or when there is substantial evidence of defendant's guilt. *People v. Nieves*, 193 Ill. 2d 513, 530-31 (2000).

¶ 33    Defendant's first claim of error contends that the State's reliance on other crimes evidence during closing argument asserted that defendant committed another crime. Defendant's argument was based on defendant's purchase of alcohol for M.B.'s brother, Emmanuel. While defendant limits the quoted argument to five sentences, the argument must be viewed in the context of closing argument as a whole. *People v. Holman*, 2019 IL App (5th) 160207, ¶ 51.

11

¶ 34    Here, the context revealed that the State's argument was based on defendant's knowledge of M.B.'s age. Prior to making the statements defendant takes issue with, the State addressed Emmanuel's testimony that revealed he was introduced as M.B.'s older brother and defendant knew that Emmanuel was only 17. The State then relied on defendant's interview statement that M.B. was "16 or 17 years old." Thereafter, the State argued:

> "[W]e also have some circumstantial evidence that she was out drinking. Apparently, that doesn't mean much. Emmanuel was out drinking. The defendant bought him the alcohol. So apparently age doesn't mean much with respect to the defendant as far as that's concerned."

The State then focused on M.B.'s role as a mother and what that said about defendant's knowledge of her age when compared with his statements during the interview.

¶ 35    Evidence related to how defendant would know Emmanuel's age was initially prohibited by the trial court's ruling on the State's motion *in limine*. However, the trial court's ruling included a caveat indicating that the original ruling on the motion could change if defense counsel "opened the door" on the issue at trial. During cross-examination, defense counsel questioned Emmanuel about his conversation with defendant involving his age. Thereafter, the State requested a sidebar, which resulted in the trial court finding that the door had been opened and the probative value of the previously prohibited testimony now outweighed any prejudice related to the evidence. The State then asked Emmanuel the topic at issue when his age came up in conversation with defendant. Emmanuel responded, "We were fittin' to go buy alcohol." Emmanuel then confirmed that he was 17 at the time of that conversation. Immediately thereafter, the State requested the court provide a limiting instruction and the court admonished the jury that the "these last questions were offered

12

for the limited purpose of demonstrating the defendant's state of mind with respect to [M.B.'s] age, and they should not be considered by you for any other purpose."

¶ 36 Here, knowing that Emmanuel was too young to purchase alcohol, and that M.B. was younger than Emmanuel, was evidence presented as to defendant's state of mind regarding M.B.'s age. The evidence was properly admitted, the jury was immediately given a limiting instruction and received a second instruction regarding this evidence prior to deliberation. The State's comment related to buying alcohol was a reasonable inference where the evidence revealed that defendant knew Emmanuel was too young to purchase alcohol and that Emmanuel's sister, M.B., was even younger than Emmanuel. Prosecutors may properly comment on the evidence presented and reasonable inferences drawn therefrom. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47. Accordingly, we find no error with the prosecutor's statement. We further note that the prosecutor never claimed that defendant was "bad" because he drank with underage people. In fact, he specifically stated, "that doesn't mean much." Moreover, the jury received two separate sets of limiting instructions, including one after the closing argument and before deliberation, which decreased any possibility of prejudice. An instruction about the limited purpose of the evidence substantially reduces any prejudicial effect of the evidence admitted. *People v. Illgen*, 145 Ill. 2d 353, 375-76 (1991).

¶ 37 Defendant next argues that the prosecutor made misstatements of evidence concerning defendant's interrogation interview by asserting that the investigator first told defendant it was illegal to have sex with someone under 17, and then defendant said he believed she was 16 or 17, instead of defendant first admitting that he believed M.B. was 16 or 17 and the officer later asking defendant if he knew that having sex with someone under the age of 17 was illegal. Defendant

13

claims that the prosecutor's misstatement was an attempt to make defendant "seem as though he was framing his response" of M.B.'s age "to fit the detective's information."

¶ 38    While the prosecutor's statement was incorrect based on the evidence, we do not find this to be reversible error. Defense counsel immediately clarified the misstatement during her closing argument and advised the jury of which statement was made first. More importantly, the context of the prosecutor's statement was not the timeline. The statement was focused on the length of time it took defendant to eventually provide the truth to the detectives during the interview. During the interview, defendant's responses related to the victim began with his stating that he did not even know the victim's name. Over the course of the interview, defendant eventually revealed the victim's name, the connection between M.B. and defendant's cousin, seeing her at his house, her possible age, the status of her intoxication on the night of the incident, and eventually blaming the incident on M.B. by stating she threw herself at him.

¶ 39    More importantly, regardless of which order the statements were made, defendant admitted that he believed M.B. may have only been 16 years old and "had to be underage" when defendant had sex with her. Accordingly, we cannot find the misstatement constitutes reversible error. Absent reversible error, plain error cannot be shown. *People v. Durr*, 215 Ill. 2d 283, 301 (2005).

¶ 40    Defendant further argues that the prosecutor's misstatements included telling the jury that defendant called M.B. a "little girl" at least eight times during his interview. We agree the prosecutor's statement was a misstatement because generally defendant's use of the phrase "little girl" during his interview referred to the daughter of Carlos and M.B. The terms defendant used multiple times during his interview were "young girl" which was how he referred to M.B. and "young kids" when referring to M.B. and Carlos. However, we note that at one point defendant did refer to M.B. as the "little girl."

14

¶ 41    While the prosecutor misstated the repeatedly used phrase during the interview as, "little girl," as opposed to "young girl," we again cannot find reversible error. This is due to the undisputed fact that defendant repeatedly and consistently referred to M.B. personally as a "young girl" in his interview and one of the "young kids" when defendant was addressing M.B. and Carlos as a couple. He further called M.B. "underage" and voluntarily advised the officers in the interview that his aunt told him to stay away from M.B. due to her age. We cannot find the prosecutor's misstatement reversible error when defendant repeatedly emphasized M.B.'s young age in the interview.

¶ 42    Defendant also argues that the prosecutor violated his duty of fairness by repeatedly calling the incident an attack on M.B. In support, defendant lists three times the prosecutor used the word "attack" and argues that the word was only used to inflame the jury's passions because it was an "unfair characterization of the evidence." We disagree. The word "attack" is defined as "[a]n act of physical aggression against another." See Oxford English Online Dictionary https://www.oed.com/dictionary/attack_n?tab=meaning_and_use#34884365 (last visited June 17, 2025). A 23-year-old man having sex with a drunk 15-year-old girl could certainly be considered an act of physical aggression. Accordingly, we disagree that the prosecutor's use of the word "attack" constituted error.

¶ 43    As noted above, our review of the closing arguments confirmed that some of the prosecutor's statements were improper. As such, we consider whether the errors were sufficient to warrant reversal under either prong of the plain error doctrine. First-prong plain error requires the evidence to be "so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." (Internal quotation marks omitted.) *Johnson*, 2024 IL 130191, ¶ 43. While errors were committed, we do not find the evidence as to

15

defendant's belief of M.B.'s age to be closely balanced. M.B. stated that she messaged defendant through Facebook which listed her age as 15. Defendant's aunt repeatedly told him to stay away from M.B. because she was underage when defendant was at Carlos's house. Defendant knew that Carlos was 15 years old and that M.B.'s older brother was 17 years old and too young to buy alcohol. He further conceded that she might have only been 16 years old in the police interview. Because the evidence was not closely balanced, we cannot find that first-prong plain error was shown.

¶ 44　The second prong of plain error requires the error to be "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id*. Second-prong plain error requires structural error which " 'renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence.' " *People v. Ratliff*, 2024 IL 129356, ¶ 37 (quoting *Moon*, 2022 125959, ¶ 28). "It is axiomatic that structural 'errors affect the framework within which the trial proceeds, rather than mere errors in the trial process itself.' " *Johnson*, 2024 IL 130191, ¶ 57 (quoting *Moon*, 2022 IL 125959, ¶ 29). "[C]omments in prosecutorial closing arguments will rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants." *People v. Williams*, 2022 IL 126918, ¶ 56.

¶ 45　Although the prosecutor made improper statements, we do not find that reversal is warranted under the second prong of plain error. First, we do not find the prosecutor's statements so egregious that they threatened the fairness of the trial. Second, the jury received two limiting instructions related to defendant's possible purchase of alcohol for Emmanuel, that cured any prejudice related to that statement. More importantly, given the evidence presented, we do not

believe that the jury would have reached a contrary verdict if the remarks had not been made. Accordingly, we find insufficient evidence of second-prong plain error.

¶ 46     Defendant also argues, in the alternative to his plain error argument, that defense counsel was ineffective for failing to preserve the errors that arose from the prosecutor's closing argument. In Illinois, ineffective assistance claims are considered under the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 694). Under these requirements, a defendant must show that "counsel's performance was objectively unreasonable under prevailing professional norms" and a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). A failure to establish either *Strickland* prong precludes the finding of ineffective assistance of counsel. *People v. Cherry*, 2016 IL 118728, ¶ 31. "[I]f it is easier to dispose of a claim of ineffectiveness of counsel on the ground of lack of sufficient prejudice to the defendant, that course should be followed." *People v. Taylor*, 166 Ill. 2d 414, 436 (1995); see also *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998) ("lack of prejudice renders irrelevant the issue of counsel's performance").

¶ 47     In the instant matter, we cannot find that a different verdict would have resulted if the prosecutor had not made the improper statements. We further note that where a defendant fails to meet the first prong of plain error as seen here, prejudice for an ineffective assistance of counsel claim cannot be shown. See *People v. Holt*, 2019 IL App (3d) 160504-B, ¶ 47. As such, we cannot find that trial counsel's failure to object to the prosecutor's statements raises a reasonable

17

probability that the result of the proceedings would have been different. Therefore, defendant's ineffective assistance claim fails.

¶ 48                                    CONCLUSION

¶ 49    For the above stated reasons, defendant's conviction is affirmed.


¶ 50    Affirmed.