NOTICE
Decision filed 09/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230269-U

NO. 5-23-0269

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Edwards County. |
| | ) | |
| v. | ) | No. 21-CF-33 |
| | ) | |
| STEVEN SCHMITTLER, | ) | Honorable |
| | ) | Michael J. Valentine, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice McHaney and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the defendant's convictions for first degree murder and unlawful possession of a weapon by a felon where the defendant failed to prove that his trial counsel provided ineffective assistance by failing to request a severance of his unlawful possession of a weapon by a felon charge from his first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm charges. Also, the State's comments during closing argument were not reversible plain error, and the defendant's trial counsel was not ineffective for failing to preserve the defendant's claims regarding these comments.

¶ 2    The defendant, Steven Schmittler, was convicted of first degree murder and unlawful possession of a weapon by a felon after a jury trial. The defendant appeals the convictions, arguing that (1) his trial counsel was ineffective where counsel failed to sever the charge of unlawful possession of a weapon by a felon from the first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm charges; and (2) he is entitled to a new trial because, during

1

closing arguments, the State misstated the evidence, denigrated the defense's key expert witness, and improperly defined reasonable doubt. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      On November 23, 2021, the State charged the defendant with three counts of first degree murder, one count of aggravated battery with a firearm, one count of aggravated discharge of a firearm, and two counts of unlawful possession of a weapon by a felon. The charges stemmed from an incident that occurred on November 20, 2021, where the victim, Tommy Burns, was shot and killed inside the home where the defendant was staying. Before trial, on September 14, 2022, the State filed a notice of intent to impeach the defendant with evidence of the defendant's prior felony conviction for theft in People v. Schmittler, No. 20-CF-28 (Cir. Ct. Edwards County, Nov. 20, 2021), if the defendant testified. At the January 3, 2023, final pretrial hearing, the trial court determined that the defendant's prior conviction was admissible for impeachment purposes if the defendant testified at trial.

¶ 5      A seven-day jury trial was conducted in January 2023, and the following testimony was presented. Michael Brown, who was currently a full-time deputy with the White County Sheriff's Department, testified that he was a patrolman for the Grayville Police Department at the time of the incident. On November 21, 2021, at 12:07 a.m., Deputy Brown was dispatched to 102 East Sycamore Street in Grayville, Illinois. Upon arriving, Ryan Duncan answered the door, told Deputy Brown what had happened at the residence, and let Deputy Brown inside. Inside the residence, Deputy Brown observed Burns lying on the floor of a room next to the living room area and a large amount of blood around Burns's body. Deputy Brown determined that Burns was deceased. Then, Deputy Brown took Duncan outside and placed Duncan in the backseat of the patrol car for safety. Once additional law enforcement arrived, Deputy Brown and the other officers "clear[ed]" the camper that was parked on the property, and they discovered the defendant

2

inside. After the defendant was secured inside a patrol car, Deputy Brown assisted the Illinois State Police (ISP) in serving the search warrants for the residence and the camper.

¶ 6    Deputy Brown explained that Duncan had told the officers about a firearm and some ammunition being thrown into the cistern located on the residence's back porch. Therefore, Deputy Brown used a magnet tied to a string and retrieved a .22 revolver and seven rounds of live .22-caliber ammunition inside a clear, plastic bag from the bottom of the well. Deputy Brown acknowledged that, when he arrived at the residence, he had to knock a few times on the front door before Duncan answered it. Deputy Brown testified that, although Duncan had said that the defendant was inside the residence, the officers instead discovered the defendant inside the camper. During the time that Deputy Brown was outside the residence, he was in the vicinity of the camper and would have seen someone coming or going. Deputy Brown did not hear any noise from the camper until the officers knocked on the door.

¶ 7    Stephanie Luker, who was an ISP crime scene investigator at the time of the incident, testified that she was dispatched to 102 East Sycamore to process the crime scene. In processing the scene, she took photographs of the residence, which included a photograph depicting an open toolbox near the area where Burns was found; she collected blood samples from the area around Burns's body; and she inventoried the revolver and the ammunition found in the cistern as well as a .22-caliber long rifle found inside the residence.

¶ 8    Then, the trial court read the parties' stipulation that, "on November 20, 2021, [the defendant] had previously been convicted of a [f]elony." Next, Ryan Duncan testified that he lived at 102 East Sycamore at the time of the incident and that the house was located across the street from a Huck's gas station. For approximately one year, the defendant lived at that residence with Duncan. During the time that the defendant lived at the house, Duncan could not recall the defendant ever sleeping in the camper parked in the yard. Duncan noted that there was no heat or

3

running water in the camper. The camper belonged to the defendant, but the defendant also had a bedroom in the house. The back door of the residence was boarded shut, so the only way to exit the house was through the front door.

¶ 9 On the evening in question, Burns, Duncan's best friend, came to Duncan's residence to work on remote control cars with Duncan. Michael Alldredge and Renee Weiss were also at the house because they were doing their laundry. At some point that evening, Duncan heard the defendant and Burns arguing, but Duncan could not hear what they were arguing about because he was in a different room.

¶ 10 After the argument, Duncan and Burns continued to work on a remote control truck while the defendant was in another part of the house. They were gathering parts for the truck when Burns mentioned that he wanted Duncan's toolbox, which was in the house. Duncan agreed, so they began removing the tools from the toolbox. While cleaning out the toolbox, Duncan heard a loud bang and observed Burns fall backwards to the floor. Duncan was standing about one foot from Burns at the time. Duncan then looked around the room and observed the defendant standing by the doorway with a pistol in his hand. The defendant began waving around the pistol, pointing it at Duncan, and saying that he was going to shoot everyone. The defendant had shown Duncan the pistol a few months before, and Duncan had told the defendant that Duncan did not want the gun in the house.

¶ 11 At the time of the shooting, Alldredge and Weiss were in the kitchen. After the shooting, Alldredge came out of the kitchen and said that Weiss was scared and wanted to leave. The defendant then told Alldredge and Weiss that they could leave, but the defendant would not permit Duncan to leave the house. Duncan then observed the defendant throw the gun into the cistern located on the enclosed back porch. The defendant then walked into the living room where Duncan saw the defendant with a rifle. Duncan remained in the kitchen because he was concerned for his

4

safety, and he believed that the defendant was still in the house. At some point, Duncan heard multiple knocks on the front door. He ultimately answered the door, and it was Deputy Brown at the door. Duncan told Deputy Brown what had happened and let Deputy Brown into the residence.

¶ 12    On cross-examination, Duncan admitted to having a problem with methamphetamine and having a 2022 felony conviction for possession of methamphetamine. Duncan explained that he did not initially answer the door when he heard Deputy Brown knocking because he thought the defendant was still inside the house. Duncan did not remember if he initially told Deputy Brown about the defendant threatening him, telling him not to leave the house, or about the defendant having a rifle. However, Duncan noted that his conversation with Deputy Brown was brief. Duncan told Deputy Brown that the defendant was still inside the house.

¶ 13    Approximately three hours after the incident, Duncan spoke with Special Agent Mike Cleek and Master Sergeant Gwen Basinger and told them that the defendant had threatened him and continued to threaten him after Alldredge and Weiss had left the house. Duncan also told them that he was scared of the defendant. Duncan acknowledged that, when the defendant was on the enclosed back porch, Duncan had direct access to the front door without passing by the defendant. However, Duncan explained that he did not leave the house because he was scared to death.

¶ 14    Michael Alldredge testified that, during the incident, he was in the kitchen doing his laundry with his girlfriend, Weiss. Alldredge heard Burns and the defendant arguing in the living room, but Alldredge could not hear what they were arguing about. Later that night, Alldredge heard a loud bang that sounded like someone had dropped a heavy item on the floor and then a thud. After hearing the noises, Alldredge heard Duncan screaming, "oh, my God" several times. Alldredge noted that it was quiet in the house before the loud noises. He then went to the doorway leading from the kitchen to the living room, so he could see what had happened. He observed the defendant standing in the doorway of another room while holding a pistol. He also saw Burns on

5

the floor. Alldredge was attempting to get Weiss out of the house when the defendant headed toward the kitchen. Alldredge noted that the defendant was angry and was talking through gritted teeth, but Alldredge could not understand everything the defendant was saying. However, Alldredge did hear the defendant say that the defendant was going to kill all of them. When the defendant asked them if they were going to tell on him, Alldredge responded that they would not and asked the defendant to let Weiss leave the house. The defendant allowed Alldredge and Weiss to leave, but Duncan remained in the house. When Alldredge exited the house, he thought the defendant was behind him, but the defendant did not leave in the vehicle with them. Alldredge did not know where the defendant went after that, and once Alldredge and Weiss left the house, Alldredge called 9-1-1 on Weiss's phone. He estimated that the time between when they left the residence and when he called 9-1-1 was 10 or 11 minutes. He waited that long to call 9-1-1 because his phone battery was dead, and they had trouble locating Weiss's phone.

¶ 15    On cross-examination, Alldredge acknowledged that, when he called 9-1-1, he told the dispatcher that he heard a gunshot and someone hitting the floor, but that was all he knew about the incident. Alldredge was interviewed by Special Agent Brian Rawls two days after the incident. Alldredge did not remember telling Special Agent Rawls that he called 9-1-1 approximately three to four minutes after leaving the residence. Alldredge also did not remember whether he told Special Agent Rawls that he saw the defendant leave the house. However, Alldredge acknowledged that he might have said that because he thought the defendant had left the house behind him.

¶ 16    Renee Weiss testified that she was in the living room when she heard the defendant and Burns arguing in the front bedroom about a bicycle. The defendant sounded upset, and she heard the defendant say that someone was "going to die tonight." At some point, the argument stopped, and Weiss went into the kitchen. Approximately 20 or 30 minutes later, Weiss heard a loud noise

6

from the front area of the house. Weiss explained that it sounded like a heavy object falling and that, immediately before she heard the noise, it was quiet in the house. After hearing the loud noise, Weiss heard Duncan screaming, "oh, my God," several times. Alldredge briefly exited the kitchen to investigate the noise, and when he returned, he told her what he had seen, which made her scared for her life. The defendant then came into the kitchen and asked them if they had heard him being threatened and whether they were going to tell on him. Weiss responded that she would not tell on the defendant. The defendant then let her and Alldredge leave the house, and Weiss did not know whether the defendant walked with them toward the front of the house or whether he remained in the kitchen. Weiss could not remember if the defendant left the house at that time. Weiss did not know Burns's condition as she did not go into that room as her sole focus was getting out of the house. Weiss believed that Alldredge called 9-1-1 approximately 15 minutes after they left Duncan's residence.

¶ 17    While the surveillance video from Huck's was played for the jury, Weiss identified her truck leaving Duncan's residence at 11:53 p.m., and the defendant walking across the Huck's parking lot at 11:58 p.m. Weiss acknowledged that, when talking with Special Agent Rawls, she said that she and Alldredge left Duncan's residence around midnight. She explained that she did not know the exact time then, but she subsequently had a chance to review the surveillance footage and recognized her truck. After leaving the house, Weiss and Alldredge went to a campground.

¶ 18    On cross-examination, Weiss indicated that Alldredge called 9-1-1 shortly after midnight, but she did not remember what Alldredge said on the call. Weiss did not know that the police were looking for her and Alldredge on the night of the incident, but they both talked to police two days later. Weiss did not remember whether she told Special Agent Rawls that the defendant had followed her and Alldredge out of the house that night. Weiss explained that she was upset at the time, so she did not remember a lot about her conversation with Special Agent Rawls.

7

¶ 19    Michael Cleek, a special agent with the ISP, testified that he was the case agent in charge of the homicide investigation. Master Sergeant Gwen Basinger and Special Agent Rawls were also involved in the investigation. As part of the investigation, Special Agent Cleek interviewed the defendant about the shooting. Master Sergeant Basinger was also present for the interview. The video recording of the interview was played for the jury. During the interview, the defendant stated that he was sleeping in his camper when the police knocked on the door. He explained that he went to the camper to sleep because people were coming into the house and were being loud. He denied shooting Burns and said that he did not believe that Duncan had said that he shot Burns. Before going to sleep in the camper, the defendant was inside the house, but Burns and Duncan were not there. He left the house, went to the ATM at Huck's, and then went to his camper. He admitted that there was a rifle in the house but denied ever touching it. He also admitted having a conversation with Burns about a missing motorized bicycle. He explained that he took the bicycle but did not steal it.

¶ 20    Special Agent Cleek testified that he also assisted in serving the search warrants for Duncan's residence and the camper located on the property. Special Agent Cleek observed a bare mattress without any sheets or pillows in the camper. Special Agent Cleek also noticed that the camper did not appear to be hooked up for electricity or water. He was also present when the revolver was found inside the cistern and observed that the cistern appeared to be approximately 10 feet deep. There were no spent .22 shell casings found in the search.

¶ 21    Special Agent Brian Rawls, who was employed with the ISP's investigations unit, testified that he assisted in the investigation by obtaining and serving the search warrants for Duncan's residence and the camper. He also assisted by obtaining the surveillance video from the Huck's across the street from the residence and by conducting the interviews of Alldredge and Weiss. During his November 22, 2021, interview with Weiss, Weiss mentioned hearing an argument

8

between Burns and the defendant that lasted for approximately 15 minutes. Weiss did not tell Special Agent Rawls that she had heard the defendant say that someone was going to die that night. Weiss told Special Agent Rawls that the defendant had left the residence at the same time she did, and that he walked toward the camper. Special Agent Rawls also testified that he had separately interviewed Alldredge that same evening. Special Agent Rawls indicated that Alldredge was unsure of the exact time that he called 9-1-1 but that, at one point, Alldredge said he called approximately three to four minutes after he left the residence. Special Agent Rawls noted three to four minutes was "one of the times" that Alldredge had said. Alldredge also said that the defendant left the residence when Alldredge and Weiss did, that the defendant walked toward the camper, and that the defendant had a gun in his hand at that time. Alldredge said that he and Weiss immediately went to their vehicle and left the residence.

¶ 22    Mark Curtis, the Edwards County coroner, testified that the cause of death for Burns was a gunshot wound to the neck, and the manner of death was homicide. A single .22-caliber projectile was removed from the back of Burns's neck, and there was no surrounding skin stippling where the bullet entered the body, which indicated that the muzzle of the gun was likely not pressed to the skin. However, Curtis acknowledged that since bodies were different, the muzzle could be relatively close to the skin, inside six inches, and there be no skin stippling.

¶ 23    Duff Haley testified that he was a senior correctional officer at the White County Jail and Detention Center, which was where the defendant was held on November 21, 2021. During Haley's shift, Haley encountered the defendant, and the defendant asked Haley, "Did I send him home?" The defendant's question was not in response to anything that Haley had said. Initially, Haley did not respond to the defendant's question. However, when the defendant again asked Haley the same question, Haley asked if the defendant was talking about the victim. The defendant nodded, and Haley responded that he believed that the victim was dead. The defendant then

9

responded, "[G]ood." After Haley's conversation with the defendant, Haley briefly spoke with Special Agent Rawls, but he did not remember whether he told Special Agent Rawls about the defendant's response to finding out that the victim was dead.

¶ 24    Amy Hart, a forensic scientist in the latent prints section at the Metro-East Forensic Science Laboratory, testified that she had been employed in her current capacity for almost 28 years. She had a bachelor of science degree in bio-chemistry, and she also participated in a two-year training program for latent print examiners offered by the ISP. Hart indicated that she did not find any latent prints suitable for comparison on the revolver or the rifle taken from Duncan's residence.

¶ 25    Nicholas Jones testified that he had been employed as a forensic scientist in the area of firearms identification at the Metro-East Forensic Science Laboratory for approximately eight years. Jones had a PhD in microbiology and had completed an 18-month training course provided by the ISP. Based on his training and experience, Jones concluded that the bullet recovered from Burns's neck was not fired from the rifle recovered from Duncan's house. However, his findings were inconclusive as to whether the bullet was fired from the revolver that was found in the cistern.

¶ 26    Suzanne Kidd, a forensic scientist specializing in the area of forensic biology and DNA, testified that she had been employed with the ISP at the Metro-East Forensic Science Center for over 32 years. She had a bachelor's degree in biological sciences and had completed a two-year training program for the biology/DNA section provided by the ISP. In her role as a forensic scientist, she performed a DNA analysis on the swabs collected as evidence in this case. She explained that the DNA-typing methods used by the ISP at the laboratory were accepted techniques in the general scientific community.

¶ 27    Kidd explained that she got a complete male profile from the blood swabbed at the scene, and she compared that DNA profile to Burns and the defendant. She concluded that Burns could not be excluded as the possible source of the DNA sample, but that the defendant was excluded as

the source. She explained that she could expect to see this combination of DNA results "in 1 and 630 octillion" times. From a swab taken from the grip of the revolver, she found a mixture of at least two individuals with a major male DNA profile suitable for comparison. She explained that a major profile was a profile that was above 50% of the mixture. Once she determined the major male profile, she compared the results with the two standards that she had of Burns and the defendant. As a result of the comparison, she excluded Burns but could not exclude the defendant as a possible source of the DNA profile. She explained that by saying that an individual could not be excluded, it was another way of saying that the individual was included as a potential donor of the sample. She also explained that the ISP laboratory tested 23 locations or markers along the DNA strand, and there were results at 22 out of the 23 locations on this particular swab. She expected to see this "combination of alleles 1 in 270 septillion times."

¶ 28    Regarding the swab taken from the trigger of the revolver, Kidd explained that she was only able to get a very limited partial profile and that she only had results in 2 of the 23 locations. Thus, she explained that the DNA sample from the trigger was not as complete as the DNA sample from the grip of the revolver. She was still able to compare the DNA sample to the defendant and Burns, although the statistical analysis was much weaker. Based on this comparison, Kidd concluded that the defendant would be included as a possible source of the DNA, but that Burns was excluded. She explained that all her opinions were based on her education, knowledge, training, experience, and methods that were generally accepted in the forensic science community. When calculating the statistical frequencies, Kidd explained that each allele was given a frequency, which was based on the FBI's national database, and at every location, there were two allele expectations. She explained that the statistical frequency number was so high because the frequencies were multiplied together to get the statistical analysis. She indicated that the number

11

grew exponentially because the frequencies were multiplied together and because so many markers were tested along the DNA strand.

¶ 29    On cross-examination, Kidd explained that there was not a standard number of locations that she needed to find to make a comparison analysis because she could exclude an individual at one location. Kidd also explained that there were quality assurance standards used for accreditation of DNA analysis laboratories, and the standard recommendation was that a laboratory test 13 locations, at a minimum. However, there was not a set standard for how many locations must have a profile before an analysis was valid. She acknowledged that her analysis did not show how DNA was transferred to an object.

¶ 30    For the defense, Dr. Ernest Chiodo testified via Zoom as an expert in DNA analysis, comparison, and testing. Dr. Chiodo testified that he was a physician, licensed attorney, toxicologist, epidemiologist, biomedical engineer, and certified industrial hygienist; and that he had 11 degrees. Dr. Chiodo explained that, to analyze DNA, the analyst used an electropherogram to determine if there was a match of two pieces of DNA at a number of different loci. He explained that, "they do these at a number of different loci, to see if they match up," and "[i]f they don't match up, it's not a match." He explained that if there was no match, then the accused was not the source of the material from the crime scene. He also explained that if there was a match at one location, that would be "fine," but the analyst would analyze a number of different locations. He indicated that 13 different loci were typically analyzed, but the analyst could analyze more to see if there was a match. If there was a match between the DNA taken from the crime scene and the DNA from the known standard at all 13 locations, then the DNA would be considered a match.

¶ 31    However, Dr. Chiodo explained that, if there was not a clear match at all locations, that indicated the individual was either not the source of the material or that location could not be clearly interpreted, and "somebody [was] making an assumption without basis that it *** matched

12

up." He noted that if it was a matter of interpretation by the laboratory technician, it should not be considered a match and should not be used. Thus, he explained that, in that scenario, the DNA would not be evidence that the accused was the source of the material from the crime scene. Dr. Chiodo also testified that DNA could be transferred from one inanimate object to another.

¶ 32    Dr. Chiodo further explained that a coincidental match was the probability that DNA that matched at 13 locations was from an individual other than the accused. Dr. Chiodo indicated that he reviewed Kidd's report, which revealed the State's opinion on a coincidental match. Dr. Chiodo noted that the statistics in the report assumed that the probability for each genetic location was independent and that the probabilities were multiplied together to get the result. However, he explained that the problem with making that assumption was that the end result was a number so completely impossible and astronomically large that it had to be an error. Dr. Chiodo opined that the analysis that Kidd used was not valid because the different loci were "probably not independent," and it was impossible to arrive at the number given by Kidd. Thus, based on Dr. Chiodo's review of the records in this case, he opined that the DNA evidence did not accurately indicate that the defendant was the source of the DNA.

¶ 33    On cross-examination, Dr. Chiodo acknowledged that he had never done any forensic DNA analysis in a laboratory setting. He explained that he was not a laboratory technician and that he only interpreted the results. However, he indicated that, before becoming a doctor, he did electrophoresis concerning DNA but not in criminal cases. He explained that an individual did not need to be a medical doctor to analyze DNA, as Kidd did in this case. He acknowledged that his website did not include DNA analysis as an area of practice, but he explained that the list was not intended to be an all-inclusive list of his areas of expertise. When asked whether he was familiar with the fact that the term "match" was not generally accepted within the forensic scientist

13

community regarding forensic DNA analysis, he indicated his disagreement with that assertion. He asked, "if we're not talking about a match, what are we talking about?"

¶ 34 Dr. Chiodo acknowledged that his report stated that the claimed "probability of a coincidental matter in [Kidd's report was] 1 in 1 octillion." However, when asked whether he would agree that "1 in 1 octillion [was] never a statistical frequency that *** Kidd reference[d] anywhere in her report," he disagreed and maintained that he got that statistic from her report. Specifically, he replied, "That's where I get that. I got it from her report. It says *** octillion. It's implied *** 1 in octillion. She may not use the words 1 in an octillion. But what does it mean, *** other than that?" Dr. Chiodo then indicated that he saw the word "octillion" in Kidd's report, although he did not recall where the word was specifically used, but the impression that he had from the report was that the analysis essentially said 1 in an octillion. He admitted that the words "1 in octillion" were not used, but the report said "octillion," and the only place where that word would be used would be to imply that probability of a coincidental match. He also noted that the use of that word was clearly an error as there were only 8 billion people on Earth.

¶ 35 Dr. Chiodo acknowledged that, in forming his opinion, he reviewed a relatively "small number of pages" of the records. He also acknowledged that he charged $3,500 for reviewing the records; $3,600 for drafting his 3½-page report; and $1,200 for testifying. He noted that these were his usual and customary fees.

¶ 36 During closing arguments, the State drew attention to Dr. Chiodo's testimony, particularly his manner of referring to Kidd, his interpretation of Kidd's report, and the relation between the fees that he charged and the work that he provided. The State also advised the jury that the standard was "beyond a reasonable doubt" and not "beyond a shadow of a doubt."

¶ 37 Following jury deliberations, the jury found the defendant guilty of first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of

a weapon by a felon. The jury also found that the defendant had personally discharged a firearm that proximately caused another person's death.

¶ 38 Thereafter, at the April 11, 2023, sentencing hearing, the trial court vacated two of the first degree murder counts since they were based on the same act and also merged the convictions for aggravated battery with a firearm and aggravated discharge of a firearm into the first degree murder conviction. The trial court then sentenced the defendant to 65 years' imprisonment for first degree murder, which included a 25-year firearm enhancement, and 5 years' imprisonment for the unlawful possession of a weapon by a felon conviction, with the sentences to be served consecutively. The defendant appeals.

¶ 39                                    II. ANALYSIS

¶ 40 On appeal, the defendant argues that his trial counsel was ineffective where counsel failed to sever the unlawful possession of a weapon by a felon charge from the first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm charges. He also contends that he is entitled to a new trial because, during closing arguments, the State misstated the evidence, denigrated the defense's key expert witness, and improperly defined reasonable doubt.

¶ 41                         A. Ineffective Assistance of Counsel

¶ 42 Claims that counsel provided ineffective assistance of counsel are evaluated under the familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Poole*, 2012 IL App (4th) 101017, ¶ 8. To establish that counsel was ineffective, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced defendant. *People v. West*, 187 Ill. 2d 418, 432 (1999). Since both prongs of the *Strickland* test must be satisfied, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *Poole*, 2012 IL App (4th) 101017, ¶ 8.

¶ 43　　As to the deficiency prong, counsel's performance is measured against prevailing professional norms. *People v. Domagala*, 2013 IL 113688, ¶ 36. When determining whether counsel's performance was objectively unreasonable, a defendant must overcome a strong presumption that the challenged action, or inaction, was the product of sound trial strategy. *Poole*, 2012 IL App (4th) 101017, ¶ 10. Mistakes in trial strategy or judgment, by themselves, will not render the representation ineffective, as a defendant is entitled to competent, not perfect, representation. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. To meet the prejudice prong, defendant must demonstrate prejudice by showing a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45.

¶ 44　　　　　　　　　　　　　　　　B. Severance

¶ 45　　Multiple offenses may be charged in the same indictment, information, or complaint if the offenses are based on the same act or on two or more acts that are part of the same comprehensive transaction. 725 ILCS 5/111-4(a) (West 2020). However, "[i]f it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require." *Id.* § 114-8(a). Here, the defendant was charged with first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon. To prove the defendant committed the offense of unlawful possession of a weapon by a felon, the State was required to present evidence of the defendant's previous felony conviction. Had the charges been severed, the defendant's prior felony conviction would not have been admissible at his first degree murder, aggravated battery, and aggravated discharge of a firearm trial, except as impeachment evidence if he testified. However, his defense counsel did not seek a severance of the charges. The defendant

16

argues that, given that the sentencing consequences between the murder charge and the unlawful possession charge were vastly different, counsel's decision not to sever the charges was unreasonable. The defendant also argues that nothing could have mitigated the prejudice that resulted from the jury hearing that he was already a felon.

¶ 46    Generally, defense counsel's decision not to seek a severance is regarded as a matter of trial strategy. *Poole*, 2012 IL App (4th) 101017, ¶ 10. "A major disadvantage of a severance is that it gives the State two bites at the apple." *Id.* For instance, an evidentiary deficiency in the first case could be cured in the second case. *Id.* Accordingly, defense counsel may decide to "pursue an 'all or nothing' trial strategy, in which the defendant is acquitted or convicted of all charges in a single proceeding." *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28. "The mere fact that an 'all-or-nothing' strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." *Id.*

¶ 47    However, defense counsel's decision not to seek a severance amounted to deficient performance in *People v. Utley*, 2019 IL App (1st) 152112. There, the defendant was convicted of possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. *Id.* ¶ 1. On appeal, the defendant argued that his defense counsel was ineffective for failing to seek a severance of the gun charges from the drug charges. *Id.* ¶ 35. The defendant argued that, to prove the gun charges, the State was required to introduce evidence of his previous convictions for aggravated battery with a firearm and delivery of a controlled substance, neither of which would have been admissible to prove the possession of a controlled substance offense alone. *Id.* ¶ 39. The defendant contended that, had counsel sought a severance under these circumstances, the trial court would have granted the motion. *Id.*

¶ 48    The *Utley* court agreed with the defendant, finding that defense counsel's failure to move to sever the charges was objectively unreasonable under prevailing professional norms. *Id.* ¶ 48.

17

The *Utley* court further concluded that there existed a significant risk that the jury's knowledge that the defendant had previously been convicted of aggravated battery with a firearm and unlawful delivery of a controlled substance would be used in determining his guilt or innocence on the unrelated drug offense. *Id.* ¶ 42. The court further concluded that the State failed to identify a trial strategy that was served by defense counsel's failure to seek a severance. *Id.* ¶ 48. Moreover, the *Utley* court noted that, unlike in *Fields supra*, defense counsel made no attempt to minimize the prejudice to defendant in lieu of filing a motion to sever, by either filing a motion *in limine* or by offering to stipulate to the defendant's predicate felonies. *Id.* Thus, under these circumstances, the *Utley* court found that counsel's inaction was not a matter of sound trial strategy and that no reasonable trial strategy was served by counsel's failure to seek to sever the charges. *Id.*

¶ 49     Here, as part of defense counsel's trial strategy, counsel sought to undermine the credibility of the witnesses who had testified about what they had observed and heard while they were in Duncan's residence at the time that Burns was killed. During the trial, defense counsel's questioning of these witnesses emphasized the inconsistencies in their testimony. Under these circumstances, defense counsel could have reasonably believed that the odds of obtaining an acquittal on all charges were greater in one proceeding, rather than in two. Specifically, defense counsel could have believed that having two separate trials could potentially have given the State the opportunity to rectify any discrepancies in its witnesses' testimony. Also, defense counsel challenged the DNA evidence with Dr. Chiodo's testimony, and counsel could have believed that having two trials could potentially have given the State an opportunity to cure any deficiencies in its response to Dr. Chiodo's testimony. Thus, defense counsel avoided the State getting two bites of the apple, which would have occurred if the charges had been severed. The fact that counsel's strategy ultimately proved unsuccessful does not mean that counsel performed unreasonably and rendered ineffective assistance.

¶ 50    In addition, we note that, in *Utley*, the State offered into evidence certified copies of the defendant's convictions for aggravated battery with a firearm and for unlawful delivery of a controlled substance, which were admitted without objection. *Id.* ¶ 15. In contrast, in this case, defense counsel stipulated that the defendant had previously been convicted of a felony. By entering into this stipulation with the State, defense counsel avoided the jury learning the exact nature of the defendant's underlying felony conviction. While an "all or nothing" strategy exposed the jury to prejudicial information that it likely would not have heard if the cases had been severed, a stipulation to the mere fact of the previous conviction mitigated the prejudice to the defendant. See *Fields*, 2017 IL App (1st) 110311-B, ¶ 28. Thus, defense counsel's decision to stipulate minimized the high risk of prejudice in disclosing the defendant's prior conviction while, at the same time, pursuing the "all or nothing" strategy. Accordingly, because the defendant has not overcome the strong presumption that defense counsel's decision not to sever the charges was a matter of sound trial strategy, the defendant's ineffective assistance of counsel claim fails.

¶ 51                                C. Closing Argument

¶ 52    The defendant next argues that the State committed prosecutorial misconduct in its closing argument by misrepresenting the evidence, denigrating the defense's key expert witness, and improperly defining reasonable doubt. At the outset, we note that the defendant acknowledges that he forfeited review of these arguments by failing to properly preserve them in the trial court. See *People v. Jackson*, 2020 IL 124112, ¶ 81 (to preserve an issue for appellate review, a defendant must object to it at trial and raise it in a posttrial motion). However, the defendant argues that these errors are reviewable under both prongs of the plain-error doctrine, or alternatively, as claims of ineffective assistance of trial counsel.

¶ 53    The plain-error doctrine allows a reviewing court to consider an otherwise forfeited error when a clear and obvious error occurs and (1) the evidence is so closely balanced that the error

19

alone threatened to tip the scales of justice against the defendant or (2) the alleged error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* Under the first prong, when determining whether the evidence is closely balanced, the reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. Under the second prong, prejudice to the defendant is presumed because of the importance of the right involved. *People v. Bell*, 2012 IL App (5th) 100276, ¶ 26. The first step in plain-error review is determining whether any error occurred at all. *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 32.

¶ 54    "Defendants arguing for reversal of their conviction based upon improper closing argument face a difficult burden." *Id.* ¶ 35. As a general rule, prosecutors are afforded wide latitude in closing arguments. *Jackson*, 2020 IL 124112, ¶ 82. Prosecutors may comment on the evidence and may argue any fair and reasonable inference that can be drawn from the evidence. *Id.* However, prosecutors may not argue assumptions or facts not based on the evidence in the record. *People v. Porter*, 372 Ill. App. 3d 973, 978 (2007). The prosecution also may not present argument intended solely to inflame the passions and prejudice of the jury. *Id.* at 978-79. However, a "prosecutorial misstatement does not necessarily deprive a defendant of a fair trial." *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 18.

¶ 55    A reviewing court will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). "Improper remarks will not merit reversal unless they result in substantial prejudice to defendant." *People v. Young*, 347 Ill. App. 3d 909, 924 (2004). The improper remarks constitute substantial prejudice if the remarks were a material factor in the defendant's conviction. *Johnson*, 2023 IL App (5th) 190426-B, ¶ 35. In reviewing a

20

claim that a prosecutor's comments were improper, a reviewing court will consider the closing argument as a whole, rather than focusing on selected phrases or remarks. *Jackson*, 2020 IL 124112, ¶ 82. The comments must be evaluated in light of the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *Young*, 347 Ill. App. 3d at 925. The reviewing court will grant a defendant a new trial if the court determines that the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). This standard is similar to the standard applied in plain-error review. *Johnson*, 2023 IL App (5th) 190426-B, ¶ 35.

¶ 56    Here, the defendant challenges the following comments made by the State at closing argument. First, the defendant contends that the prosecutor improperly argued facts not in evidence when the prosecutor commented that, although Dr. Chiodo used the word "match" several times when explaining his findings, "match" was not proper terminology used in the forensic science community. During argument, the State commented that Kidd never used the word "match" during her testimony because that term was essentially out-of-date terminology.

¶ 57    In arguing that there was sufficient evidence to support the prosecutor's argument, the State points to, in part, its cross-examination of Dr. Chiodo. Specifically, the State asked Dr. Chiodo whether he was aware that the word "match" was not generally accepted in the forensic community. However, Dr. Chiodo disagreed with that statement and questioned, "[I]f we're not talking about a match, what are we talking about?" Thus, although the State's question implied that "match" was not the proper terminology, Dr. Chiodo's response did not support that assertion. Also, the State did not present any evidence to support its assertion that "match" was not the proper terminology. At one point during Kidd's testimony, she indicated that describing the results of a particular DNA analysis in terms of whether they "match up" could be considered correct in lay

21

terms. However, Kidd never testified that "match" was not considered the proper terminology in the forensic science community. Thus, we find that the prosecutor's comment was not based on the evidence.

¶ 58     Second, the defendant contends that the prosecutor improperly argued facts not in evidence when the prosecutor commented that although Dr. Chiodo talked about the "1 in 1 octillion" statistic being included in Kidd's report, Dr. Chiodo could not point to where in Kidd's report that statistic was discussed. The State then commented that the statistic was actually not discussed in Kidd's report. However, Kidd's report was not admitted into evidence. The defendant contends that since the report was not entered into evidence, the prosecutor's comment was not based on the evidence. In response, the State acknowledges that Kidd's report was not admitted into evidence but contends that the report's contents were admitted through Kidd's testimony, which provided the statistical probabilities for each item of evidence taken from Duncan's residence. After carefully reviewing the record, we conclude that the State is correct that Kidd never mentioned a "1 in 1 octillion" statistic when she testified about the statistical frequencies for each evidentiary item that she analyzed. Thus, even though the report was not admitted into evidence, we find that the prosecutor's comment was based on the evidence that was presented since Kidd testified about the statistical frequencies of the evidence that she analyzed. However, even assuming that this comment was not based on the evidence, and was error, we still find that the defendant is not entitled to a new trial, as will be fully explained below.

¶ 59     Third, the defendant contends that the prosecutor made comments intending to disparage Dr. Chiodo and to suggest that Dr. Chiodo's testimony was unreliable because Dr. Chiodo was paid by the defense. Specifically, during closing argument, the State made the following comments:

22

"But Dr. Chiodo they wanted to use to try to discredit Suzanne Kidd. If you'll remember, he called her a lab tech. That was his words. Not words I would use, because I know she's a Forensic Scientist. You do, too, because she testified about that. But I guess that's his disparaging terminology when he's trying to discredit someone, to call her a lab tech. Somebody who's worked at the lab for over 20 years, goes to work everyday. Not someone who gets paid $3,500 to review a handful of papers of a report that he then later misquotes in his own report, because it doesn't sound like he really looked at it very much.

And then, another $3,600 to draft a report of which most of it's his qualifications, telling you how cool he thinks he is. Well, the opinion section, you get down to that, there's not much there."

¶ 60 Regarding the implications that can be made from Dr. Chiodo's references to Kidd as a "laboratory technician," we find that it was fair for the State to suggest that such references could be interpreted as Dr. Chiodo implying that Kidd's background and experience made her less qualified and her testimony entitled to less weight than his own. During the trial, Dr. Chiodo testified that the DNA analysis that Kidd used was not valid, that it was impossible to arrive at the number given by Kidd, and that the DNA evidence did not accurately indicate that the defendant was the source of the DNA. In testifying as to his differing opinion, Dr. Chiodo referred to Kidd as a "laboratory technician" or "technician." The defendant contends that Dr. Chiodo did not use these terms in a belittling manner but merely to explain that Kidd performed work in the laboratory and that he no longer did that type of work. Although that may be the case, we find that the prosecutor's inference was a reasonable inference based on the evidence. The jury heard Dr. Chiodo testify and his tone when he referenced Kidd and could thus determine whether it believed that Dr. Chiodo was implying that Kidd was less qualified and less experienced in DNA analysis than him.

¶ 61 Also, concerning the prosecutor's comments about Dr. Chiodo being paid by the defense, we note that a prosecutor may properly comment on matters that affect witness credibility, which includes the fact that a witness has been paid to testify. See *People v. Holmon*, 2019 IL App (5th)

23

160207, ¶ 63. However, even if we find that the prosecutor's comments were inflammatory and improper, this conclusion will not constitute reversible error, as fully explained below.

¶ 62   Lastly, the defendant argues that the prosecutor improperly defined "reasonable doubt" for the jury. During closing arguments, the State argued that it had the burden of proof "beyond a reasonable doubt—not beyond a shadow of a doubt. Beyond a reasonable doubt." It is well established that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury. *People v. Speight*, 153 Ill. 2d 365, 374 (1992). In *People v. Burman*, the court found that the State improperly defined reasonable doubt during rebuttal argument when the prosecution stated, " 'We have to prove [defendant's guilt] beyond a reasonable doubt. However, it's not beyond all doubt. It's not beyond an unreasonable doubt.' " 2013 IL App (2d) 110807, ¶¶ 40, 44. Similarly, in this case, the prosecution improperly attempted to define reasonable doubt by describing what it was not.

¶ 63   However, even though we have concluded that the State improperly attempted to define reasonable doubt, and may have made some other improper remarks during closing argument, we must determine whether these misstatements compel a new trial under either prong of the plain-error doctrine. First, under the first prong, we find that the evidence in this case was not closely balanced. Three eyewitnesses testified that they heard the defendant and Burns arguing before the shooting and observed the defendant holding a gun immediately after the shooting. Although Duncan did not see the defendant shoot Burns, Duncan was standing approximately one foot from Burns when Burns was shot. Duncan heard a loud bang, observed Burns falling to the floor, and observed the defendant in the doorway holding a gun. Duncan then observed the defendant waving around the gun; threatening to shoot everyone in the house; and, once Alldredge and Weiss had exited the residence, throw the gun into the cistern located on the enclosed back porch, which was where the gun was ultimately recovered.

24

¶ 64    Alldredge also heard a loud bang followed by a thud, and Duncan screaming, "oh, my God" several times. When Alldredge exited the kitchen to investigate the noises, he saw the defendant standing in the doorway holding a pistol and Burns on the floor. Alldredge also heard the defendant threatening to kill everyone and asking whether they were going to tell on him. Consistent with Alldredge, Weiss also testified that she heard the loud noise, heard Duncan screaming "oh, my God," several times, and then witnessed the defendant threatening them. Also, from the DNA analysis of the swab taken from the revolver's grip, the defendant could not be excluded as a possible source of the DNA profile as there were results at 22 out of 23 locations on the swab. Even though the DNA analysis from the gun's trigger was much weaker than the analysis from the grip, the forensic scientist also could not exclude the defendant as a possible source of the DNA on the trigger. Further, in addition to the eyewitness testimony and the DNA evidence, corrections officer Haley testified about a conversation that he had with the defendant after the shooting. During that conversation, the defendant inquired as to whether he had sent "him" home; and when Haley eventually replied that the victim was deceased, the defendant responded, "[G]ood."

¶ 65    The defendant contends that the evidence is closely balanced due to the credibility issues with the testifying witnesses. Specifically, the defendant notes that, although Duncan testified that he was scared of the defendant, Duncan did not leave the residence after the shooting when the defendant was on the back porch or when the defendant left the house to go to Huck's. The defendant argues that Duncan's conduct suggests that the defendant was not the shooter. Also, during their police interviews after the shooting, Alldredge and Weiss both told the officers that the defendant followed them outside when they left the residence. However, their account changed at trial when they testified that they did not believe that the defendant left the house with them. Alldredge also told police that he called 9-1-1 three to four minutes after leaving the house, but he testified that he called 10 minutes later. The defendant contends that Alldredge changed his story

25

to be consistent with the 9-1-1 call log. In addition, Weiss testified that she and Alldredge drove to the campground after leaving the house, but the Huck's surveillance video showed that their vehicle was not headed in that direction. Weiss also testified that, before the shooting, she heard the defendant say that someone was going to "die tonight," but she did not tell Special Agent Rawls about the defendant's statement.

¶ 66    In addition to the above inconsistences in the witnesses' testimony, the defendant notes that Dr. Chiodo testified that the DNA analysis conducted by Kidd was not valid and that DNA evidence from the revolver's grip did not accurately indicate that the defendant was the source of the DNA. The defendant also notes that the findings were inconclusive as to whether the bullet recovered from Burns's neck was fired from the revolver that was recovered from the cistern.

¶ 67    Although Dr. Chiodo's testimony contradicted Kidd's analysis of the DNA evidence, this is not a situation where the credibility between contradictory witnesses was the only basis upon which the defendant's guilt or innocence could be determined. Instead, as we previously noted, the witnesses here testified consistently about what occurred during the shooting and about seeing the defendant with a gun immediately after the shooting. During Duncan's testimony, he acknowledged that he had direct access to the front door when the defendant was on the back porch, but he explained that he was scared to death. Also, there were minor inconsistencies between Alldredge and Weiss's testimony and their police statements regarding whether the defendant followed them out of the house that night and about the timing of the 9-1-1 call. However, these inconsistencies are not so fundamental as to render the evidence closely balanced. Accordingly, we find that the evidence was not so closely balanced as to warrant reversal under the first prong of the plain-error doctrine.

¶ 68    We also find that reversal is not warranted under the second prong of the plain-error doctrine. Our supreme court has held that "comments in prosecutorial closing arguments will

26

rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants." *People v. Williams*, 2022 IL 126918, ¶ 56. Based on the evidence presented to the jury, we do not believe that any rational jury would have reached a contrary verdict had the improper remarks not been made. Thus, we find that the improper remarks did not constitute a material factor in the defendant's conviction. Moreover, we note that the jury was properly instructed regarding closing arguments, which limited any potential prejudice. See *Johnson*, 2023 IL App (5th) 190426-B, ¶ 45. Also, immediately after both the prosecution's comments about Dr. Chiodo using the term "match" and about Dr. Chiodo being paid, the trial court admonished the jury that any statement made by a lawyer that was not based on the evidence should be disregarded and that the jury should use its own recollection of the evidence. The trial court also reminded the jury that what the lawyers said during argument was not evidence. Thus, the trial court's repeated instructions minimized any prejudicial effect from the prosecutor's comments. Further, regarding the prosecutor's attempt to define reasonable doubt, the jury was properly instructed on the State's burden of proof. Thus, the prosecutor's isolated comment about reasonable doubt was unlikely to mislead the jury.

¶ 69    The defendant also argues that assuming *arguendo* that the prosecutor's comments were harmless on their own, the cumulative weight of the State's improper remarks prejudiced the defendant. The defendant argues that the State's mischaracterization of Dr. Chiodo's testimony and misstatement of law complemented each other as the State was able to improperly bolster its evidence with attacks on Dr. Chiodo while also potentially reducing its evidentiary burden by improperly defining reasonable doubt.

¶ 70    "In unusual cases, the cumulative effect of numerous errors can create a pervasive pattern of unfair prejudice despite the fact that none of the errors, standing alone, would be serious enough to warrant consideration under the second prong." (Internal quotation marks omitted.) *Id.* ¶ 43. In

27

this situation, the reviewing court must determine whether the defendant's substantial rights have been affected to such a degree that the court cannot state with confidence that the defendant's trial was fundamentally fair. *Id.* If the reviewing court cannot state with confidence that the defendant's trial was fundamentally fair, then reversal is warranted, even if the evidence of the defendant's guilt is overwhelming. *Id.* Viewing the prosecutor's improper comments in the context of the entire closing argument, we conclude that the improper remarks did not affect the defendant's substantial rights to such a degree that his trial was fundamentally unfair or that the comments were a material factor in the verdict. Thus, based on our review of the record, we cannot say that, even considering the cumulative weight of the prosecutor's comments, the defendant's trial was fundamentally unfair. Accordingly, we find that reversal is not warranted under the second prong of the plain-error doctrine.

¶ 71 Alternatively, the defendant argues that defense counsel was ineffective for failing to preserve the defendant's claims regarding the prosecutor's improper remarks. The defendant notes that defense counsel objected to some of the improper comments but failed to make additional objections during the trial and/or include each instance of prosecutorial misconduct in a posttrial motion. As previously noted, to prove ineffective assistance of counsel, the defendant must show that counsel's representation fell below an objective standard of reasonableness and that but for counsel's unprofessional errors, a reasonable probability exists that the result of the proceedings would have been different. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Here, the defendant cannot show that a reasonable probability exists that the result of the proceeding would have been different had defense counsel objected to the prosecutor's improper comments during the trial and/or in a posttrial motion. Thus, the defendant's ineffective assistance of counsel claim also fails.

¶ 72                                        III. CONCLUSION

¶ 73    For the foregoing reasons, the defendant's convictions are affirmed.

¶ 74    Affirmed.